IN THE MATTER OF THE ESTATE OF OLIVE L. SHEPARDSON.
JAMES C. POTTER'S APPEAL.

*Wills—Undue influence—Evidence of facts before marriage of testatrix and legatee—Stenographer's notes.*

1. He who objects to a will for undue influence has the burden of proving affirmatively that it has been exerted; and the proof must often consist of circumstances trivial in themselves and convincing only when taken together.

2. Undue influence, to defeat a will, must be such as to destroy freedom of action at the time of making it; but it may have been exerted before and be operative in subsequent effects.

3. The facts which show undue influence upon a testator must, in the case of married persons, be inconsistent with any other hypothesis; and such as will show that the influence amounted to coercion or fraud. But where there is no relationship, or the relation is only fiduciary the inferences from the evidence may be different from what they would be in the case of a will made by husband or wife in the other's favor.

4. A doctor who had parted from his wife but had not yet been divorced, was treating a sickly widow who had means. Being afterward

divorced he married the widow and in less than seven weeks she died. Before the divorce the two had talked about making their wills each in the other's favor, and the woman had actually made a will with which the man was dissatisfied. On the day of her death she made another, in which she gave her husband an absolute estate of inheritance, though she had evidently been made to suppose that it conveyed a life estate only. They had not been acquainted three years altogether. *Held* that in contesting the probate of the will for undue influence a broad latitude of inquiry should have been allowed, and the relations of the pair before marriage as well as afterwards, including letters passing between them, might properly be shown so far as they tended to throw any light on the question of undue influence.

5. Admissions by a party to the record may be shown by his opponent whether made upon the witness stand or elsewhere, and those who heard them made may be called to testify to them. And a literal transcript of accurate stenographic notes of such admissions may be introduced in proof that they were made.

6. The ground upon which divorce proceedings were taken against a man is inadmissible upon the issue whether he exerted undue influence in obtaining a will in his favor from a subsequent wife with whom he had business relations before the divorce was granted.

Error to Wayne. (Jennison, J.) Feb. 1.—March 6.

Appeal in probate. Contestant brings error. Reversed.

*Wilkinson, Post & Wilkinson* for appellant. Proof of unlawful relations before marriage is admissible upon the question of undue influence in obtaining a will: *Dean v. Negley* 41 Penn. St. 312; *Monroe v. Barclay* 17 Ohio St. 302; Redf. Am. Cases on Law of Wills 450; *Rudy v. Ulrich* 69 Penn. St. 177; *Main v. Ryder* 84 Penn. St. 217; *Denton v. Franklin* 9 B. Mon. 28; *Kessinger v. Kessinger* 37 Ind. 341; a transcript of stenographic notes of the evidence of a party is admissible against him : *Fisher v. Kyle* 27 Mich. 454.

*George W. Coomer* for appellee. Improper relations before marriage cannot be shown in proof of undue influence in obtaining a will : *Eckert v. Flowry* 43 Penn. St. 46; *Turner v. Cheesman* 15 N. Y. Eq. 343.

CHAMPLIN, J. In this case Noah Shepardson filed the will of his wife, Olive L. Shepardson, for probate, in the probate court for the county of Wayne, he being one of the legatees

and the executor of said will. At the hearing in the probate court, James C. Potter, the father of Mrs. Shepardson, appeared as a contestant of the will. The probate court refused to admit the will to probate. Proponent appealed to the circuit court for the county of Wayne, where the will was sustained. Contestant brings error.

The grounds upon which the probate of the will was contested were want of capacity to execute it, and undue influence exercised by Noah Shepardson, the principal legatee and executor.

The record discloses that Dr. Shepardson, the proponent, was married to the decedent on the 8th day of June, 1882, and that she died July 22d following. She had been, previous to her marriage, a widow, and had been under his treatment as her physician. It also appears that the proponent had, previous to the marriage above referred to, been married, and had separated from that wife in 1879. There was evidence going to show that in January, 1882, which was some six months prior to the marriage, Mrs. Shepardson, then Mrs. Brunthaver, had made a will while she was at Plainwell, and had sent it to proponent, who was then located at Wyandotte; and that afterwards she had destroyed this will because he was not suited with the disposition of the property she had made. This was before the proponent's first wife had obtained a divorce from him.

The proponent was called to testify by the contestant, and was allowed to state that there had been talk between himself and Mrs. Brunthaver as early as 1881 about her making a will, but was not permitted to state what was said about it at that time. From statements which he made to her father and mother at the time of his wife's funeral [it appeared] that there had been an agreement between him and the decedent that they should each make a will in favor of the other, to the effect that whichever should die first the survivor should have the use of the property left by the deceased, during life, and then it should go to the heirs of such deceased person; and that the will in question was made by her to carry out the agreement. Mrs. Shepardson was taken ill

on Wednesday and died on Saturday, at about four o'clock in the afternoon. Proponent was with her alone during Friday night, and became satisfied that she was so sick she could not recover about one or two o'clock on Saturday morning. The attorney who drew the will states that he received a message, about eight o'clock in the morning of the day Mrs. Shepardson died, to come to Dr. Shepardson's drug store; that on arriving there he met proponent, who told him that his wife wished him to draw some papers for her, and took him into the room where Mrs. Shepardson was lying in bed, and introduced him to her, and she stated to him that she wished to make a will; that he sat down by the bed and made a memorandum of how she wished to dispose of her property, and then went to his office and drew the will according to the instructions she had given and the memorandum taken, and returned in about half an hour and read it over to her, and she pronounced it correct and executed it; that Dr. Shepardson was out and in while he was taking the memorandum and while she was executing the will, and asked her about two or three items of property, what she wanted done with them—the things at her father's, and the lots in Ohio.

The contestant called witnesses and proposed to prove that the deceased was an invalid from the fall of 1880 until the fall of 1881, and that Dr. Shepardson treated her as her physician during that time, and also proposed to show the relations of the deceased and proponent, and that these relations were brought about by proponent and continued until the fall of 1881; and to establish this proposition he asked a witness these questions: " Did she ever live at your house?" " State whether to your knowledge, at Fremont, in the state of Ohio, Dr. Shepardson attended the decedent as her physician, and what time that treatment commenced?" " Up to what time did he treat her as her physician?" " Do you know from the doctor's statement or otherwise, what the malady was for which he treated her?" " State when it was, if you know, that Mrs. Brunthaver came away from Fremont?" " State whether at this time Dr. Shephardson had

a wife with whom he was living, and a family of children ? "
"How long did the doctor treat Mrs. Brunthaver at Fremont,
Ohio ? " "Do you know what time the doctor left Fremont ?"
"Do you know when Mrs. Brunthaver left Fremont ? " "Do
you know whether the doctor and Mrs. Brunthaver came away
from Fremont together ? " "Do you know how intimate their
relations were while she was there at your place ? " "Do you
know when the doctor and his first wife separated, and ceased
to live together as husband and wife ? " The witness then
testified that at that time Dr. Shepardson was acting as busi-
ness agent for decedent, and counsel for contestant then
asked witness, "Do you know what amount of property
she had at that time ? " All of these questions were severally
objected to and excluded as immaterial, the court remarking
"that if no marriage had afterward taken place between
proponent and deceased the case might stand differently, but
as she afterwards married the proponent this made a great
difference."

The following questions were put to Mrs. Eliza Potter, the
deceased's mother, and objected to as immaterial, and excluded:
"Do you know at what time your daughter became acquainted
with him ? " "State from what occurred in your presence,
whether the doctor had any influence over your daughter ? "
"How many times was the doctor at your house ? " "When
was he last at your house ? " "What were the relations of
your daughter, the deceased, to yourself and your husband,
her father and mother ? " Witness then testified that during
the latter part of the year 1881 her said daughter had a talk with
her about what disposition she intended to make of her prop-
erty, and said she intended her property, after her death,
should go to her parents—to her mother, especially; that she
spoke of it several times, and the last time was just before she
went to Plainwell on a visit, in December, 1881.

Witness was then asked. "Did you ever at any time see
among her papers, a written memorandum, in her handwrit-
ing, with reference to her will ? " To this question counsel
for proponent objected as immaterial, as it was before the
marriage to the doctor. Counsel for contestant explained

that it was a memorandum as to what disposition she would make of her property  The court asked the witness when it was, and she answered that it was before the last conversation about the property.  Thereupon the court sustained the objection, and the counsel for the contestant duly excepted.

Witness further testified that the several conversations with the doctor about the will that she had testified to, occurred at Wyandotte, and that afterwards, at the funeral, while she and her husband and the doctor were riding together in a buggy, the doctor said he promised the deceased that if she would make the will to him it would only be for a short time; that he could not live long, and that then it should all come back to her parents as she wished it should.

Witness further testified that when her said daughter died there was at witness' house, belonging to her daughter, a horse, a buggy, a harness, an old robe, some household furniture, some silver ware, carpets and bedding.

Counsel for contestant called as a witness J. C. Potter, who testified that he was the father of the deceased, and remembered seeing Dr. Shepardson at the funeral, and heard him state to Mrs. Potter that he asked deceased to make a will willing the property to him, and that he told her that after his death it should all go back to her parents as she wished it to; that this was in the buggy, going from the house to the church at the time of the funeral.

While the witness Dr. Shepardson was being examined by counsel for contestant he testified that his wife took proceedings against him to obtain a divorce.  He was then asked: "When were the papers served?"  This question was objected to and excluded as immaterial.  The following questions were asked of the witness Dr. Shepardson and excluded as immaterial, viz:  "Whether he did not have from deceased a power of attorney to do her business."  "Whether on or about November 1, 1881, he did not enter into an agreement with the deceased with reference to their going into partnership in the drug-store at Wyandotte."  "Did you ever sketch off a will for her—a draft of a will for her—prior to her making of the will at Plainwell?"

"Did you write to her while at Plainwell, during the holidays of 1881–82, with reference to making a will?"

And finally the judge charged the jury in substance, that there was no evidence of undue influence exercised over decedent when she made the instrument in question, and that as there was no evidence controverting that of the witnesses for proponent that she was of sound mind, they should return a verdict for proponent, which they did without leaving their seats.

The rule of law which excludes all presumption of undue influence over a person of sound mind requires him who asserts that the instrument ought not to have any force or effect because it was obtained by undue influence, to prove affirmatively that it was so obtained. How can he do this unless he is permitted to show the previous relations within a reasonable period of time, which existed between the parties? This proof must be made out in most if not in all instances by circumstantial evidence; by proof of facts and circumstances which, standing alone, might prove nothing, but when taken together, and in relation to other facts, might tend to satisfy a jury of the existence of the principal fact of undue influence. *Beaubien v. Cicotte* 12 Mich. 459; *Porter v. Throop* 47 Mich. 313, 326.

The learned judge in the court below seems to have based his rulings upon the hypothesis that the inquiry must be limited to the time the marriage relation existed between these parties; and that whatever may have been their relations previously it was immaterial to inquire. This was confining the scope of inquiry to very narrow limits, and was not justified by the facts and circumstances of the case. The parties were married on June 8th, and Mrs. Shepardson died July 22d, and I can discover no good reason why the inquiry might not have been made to embrace the relations of these parties to each other, both before and after the marriage. If the testimony offered would have a tendency to prove that Dr. Shepardson had acquired an undue influence over the mind of the testatrix before their marriage, and that influence

could be traced to the act of making the will, and exercised a control over her disposition of her property, and possessed the quality which brought it within the category of undue influence, it was competent to be shown, and such evidence would be material testimony. The undue influence which operates to defeat a will must be such as overcomes the free action of the mind at the very time of making the testamentary disposition of property, but the pressure may have been brought to bear previously; and if it remained so as to coerce the mind of the testatrix at the time the will was executed, it cannot be upheld as her act. Undoubtedly, the inferences and conclusions to be drawn from the evidence, when the charge of undue influence is in a case where the will is made by a husband or wife in favor of the other, may be quite different from what it would be when applied to cases between guardian and ward, or other persons standing in fiduciary relations to each other, or between a testator and a person occupying no fiduciary or blood relation. Manifestly, to establish undue influence in persons occupying the relation of husband and wife, the facts and circumstances shown must not only be consistent with the hypothesis of the will having been obtained by undue influence, but it must be shown that they are inconsistent with a contrary hypothesis. And the facts and circumstances must be such that when all the evidence is considered, the jury can say that the acts which constituted the undue influence were such as amounted to coercion or fraud. *Boyse v. Rossborough* 6 H. L. Cas. 2, 47.

In the present case the will was made when the testatrix was in extremis. The proponent was present during a part of the time, and called her attention to certain portions of her property, and asked her what disposition she wished to make of the Ohio property and the property at her father's. It appeared also that there had been an agreement between these parties, made before they were married, that each should make a will in favor of the other, giving to the survivor a life estate in the property, with remainder over to the heirs of the testator or testatrix; that she had executed one will before their marriage in his favor, and that he had destroyed it

53 MICH—8 .

at her request.   And by the proponent's own statements, made immediately after the execution of this will, it appears that he claimed that this will was executed to carry out the agreement above referred to, and that the testatrix's intention was simply to give him a life estate in the property devised to him, and at his death it should come back to her parents. The instrument presented by him for probate reads as follows:

"I, Olive Lucinda Shepardson, of the city of Wyandotte, Wayne county, Michigan, wife of Dr. Noah Shepardson, of the same place, mindful of the uncertainties of human life, do make, publish and declare this my last will and testament in manner following:

1. After the payment of my just debts and funeral expenses, I give, devise and bequeath to my husband, Dr. Noah Shepardson, all my interest in the drug-store property in Wyandotte, Michigan, to have and use as he shall deem proper during his life-time; and after his death, the proceeds, if any remaining, to go to my next of kin.

2. I give, devise and bequeath to my aforesaid husband, Noah Shepardson, and to his heirs and assigns, forever, the three lots of land now owned by me at Manhattan, near Toledo, Ohio; and after his death, if there are any proceeds remaining, it is my will and desire that the same shall be given by him to Ida Voltaire of Toledo, Ohio.

3. I give and bequeath to my mother, Eliza Potter, of Erie, Monroe county, Michigan, all my household furniture now at her place, together with all my wearing apparel.

4. I give and bequeath to my father, James Potter, of Erie, Michigan, all the personal property of every name and nature, including money, belonging to me and now in possession of my said father.

5. I give and bequeath to my aforesaid husband, Dr. Noah Shepardson, the rent of the farm at Belleville township, Sandusky, Ohio, which will be due October, 1882.

6. I hereby nominate and appoint my aforesaid husband, Dr. Noah Shepardson, the executor of this my last will and testament, and hereby authorize and empower the said Noah Shepardson to compound, compromise and settle any claims or demands which may be against or in favor of my said estate.

In witness whereof I have hereunto set my hand and seal this 22d day of July, A. D. 1882.

[Signed]          OLIVE L. SHEPARDSON.   [L. S.]"

Instead of devising to him a life estate in her lands, with remainder over to her parents, she by this will gives to him an estate of inheritance, and also the absolute power of disposition of the personal property mentioned in the first clause. If her intention in making her will was as he states it to have been, then there was a palpable fraud perpetrated upon this dying woman, which no court can tolerate for a moment. The evidence of fraud was quite sufficient to authorize the introduction in evidence of the testimony which was excluded by adverse rulings to the questions above propounded.

There should have been a broad latitude of inquiry allowed as to the relations existing between these parties, and such inquiry might extend back and cover the entire time of their acquaintance with each other, which, as was claimed, was within three years of the period of her death, so far as those relations, and the facts and circumstances on which they were based, tended to throw any light upon any undue influence exerted over the testatrix by the proponent, which resulted in the will in question.

The contestant introduced the stenographer who took in short-hand the testimony given by Dr. Shepardson in the probate court, who produced what he claimed was the testimony given by the doctor, written out in English. He testified that it was literally correct, and no question as to its being correct was raised by counsel for proponent. The contestant offered to read portions of the transcript of Dr. Shepardson's testimony in evidence, from page 22, to show admissions made by the proponent on that trial. This was objected to and excluded by the court.

Admissions made by a party to the record, whether upon the witness stand or elsewhere, relative to matters material to the issue, may be given in evidence by the opposite party, and persons hearing the admissions made may be called to prove what was said. And if a person present at the time the admission was made reduces it to writing in the exact language used, and testifies to that fact, and there is no question as to its correctness, I can see no objection to introdu-

cing the writing itself in evidence. The object of all testimony is to elicit the exact truth, and that evidence is the best from which all possibility of error is eliminated.

The court rightly excluded the evidence offered relative to the divorce proceedings. The charge there made as a ground for divorce was not admissible evidence under the issue in this case between the contesting parties. The letters offered in evidence, taken in connection with other testimony which ought to have been received as showing the relation between these parties, were admissible in evidence.

The proceedings of the circuit court are reversed, and the case remanded for new trial.

The other Justices concurred.