IN RE ESTATE OF REDFERN. MATHESON, APPELLANT, *v.* REDFERN ET AL., RESPONDENTS.

(No. 4,707.)

(Submitted March 17, 1922. Decided June 30, 1922.)

[208 Pac. 1072.]

*Wills—Revocation—Lunacy—Evidence — Declarations Against Interest—Admissibility—Presumptions.*

Wills—Revocation—Insane Delusions—Evidence—Declarations Against Interest—Admissibility.

1. In a daughter's action to revoke her father's will on the ground of his insane delusion that she had tried to poison him, a letter to plaintiff from defendant, her brother, the sole beneficiary under the will, explaining the reason the testator gave for disinheriting her, and her offered testimony that defendant stated to her in the presence of her attorney that testator had said that his reason was that she had tried to poison him, were improperly excluded, they having been admissible as declarations against interest. (See, also, concurring opinion of MR. JUSTICE GALEN at [1].)

Lunacy—Insanity—Presumptions.

2. Lunacy or insanity, if of a general, *habitual* or permanent nature, once shown to exist, is presumed to continue until the presumption is overturned by countervailing evidence. (Foregoing holding in *Murphy* v. *Nett*, 43 Mont. 353, disapproved by majority of court, so far as use of word "habitual" is concerned. See concurring opinion of MR. JUSTICE GALEN at [2].

---

1. What constitutes insane delusions as affecting capacity to make will, see note in L. R. A. 1915A, 458.

*Appeals from District Court, Madison County; William A. Clark, Judge.*

ACTION by Catherine Elizabeth Matheson against John C. Redfern, to revoke the will of William J. Redfern, deceased. Judgment for defendant and plaintiff appeals from it and from an order refusing a new trial. Reversed.

*Mr. H. P. Beckett* and *Mr. E. B. Howell,* for Appellant, submitted a brief; *Mr. Howell* argued the cause orally.

There are only two questions involved in this appeal, both of which have already been decided by this court:

1. Where the only defendants are the sole beneficiaries and the executor named in a will, are the admissions against interest of the beneficiary competent evidence on the question of the testamentary capacity of the testator? In support of the proposition that they are, we cite *Murphy* v. *Nett,* 47 Mont. 38, 130 Pac. 451.

2. Where, in an action to contest the probate of a will on the ground of the unsoundness of mind of the testator, substantial evidence has been introduced showing that the testator at and before the time of making the will had a fixed insane delusion that his daughter had tried to poison him, is it error for the court to grant a motion for nonsuit?

In ordering the jury to bring in a verdict in favor of the contestees and entering judgment thereon, and thereafter refusing to set aside said verdict and grant a new trial, the court in effect granted a nonsuit against the plaintiff, and this was error for the reason that plaintiff had introduced substantial testimony of an habitual, fixed and permanent insane delusion on the part of the testator that had affected the provisions of the will adversely to the plaintiff. (*Mayer* v. *Carothers,* 14 Mont. 274, 36 Pac. 182; *Stewart* v. *Stone & Webster Eng. Corp.,* 44 Mont. 160, 119 Pac. 568; Alexander's Commentaries on the Law of Wills, p. 466.)

"Lunacy, or insanity, if of a general, habitual or permanent nature, once shown to exist, is presumed to continue until the presumption is overturned by countervailing evidence. This rule is recognized by the courts generally. Where its existence is made to appear, the presumption referred to attaches; for we know from experience that the condition usually continues." (*In re Murphy's Estate,* 43 Mont. 353, 373, Ann. Cas. 1912C, 380, 116 Pac. 1004.) There is nothing intermittent about this insane delusion of this morbid old prospector living in his lonely cabin in California Gulch. Plaintiff's eating the suspected jelly or doughnuts in his presence did not phase his fixed belief that she had tried to poison him. Months and years after his daughter had left him he still revealed in his talks with Mrs. Widner the same insane delusion. Apart from the letter and admissions of defendant, John C. Redfern, which would have proved the existence of this delusion at the time of the making of the will and that it affected the provisions of the will, there was a presumption of law that the delusion which had been definitely shown by the evidence to have existed for several years and up to a date within six months of the making of the will, continued to exist and did exist at the time the will was made and did affect the provisions of the will to the detriment of plaintiff, and this presumption and this evidence should have been permitted to go to the jury.

*Mr. M. M. Duncan,* for Respondents, submitted a brief and argued the cause orally.

The essence of an insane delusion is that it has no basis in reason and cannot be dispelled by reason. (*In re Kendrick's Estate,* 130 Cal. 360, 62 Pac. 605; *Hall's Heirs* v. *Hall's Exrs.,* 38 Ala. 131; *McBride* v. *Sullivan,* 155 Ala. 166, 45 South. 902.) Where there is no evidence showing reason, or want of reason, for an opinion held by a testator that his relative or natural heir at law had threatened to or intended to do him injury, there is no proof of an insane delusion

on the part of the testator on that subject. (*In re Skinner's Estate*, 40 Or. 571, 62 Pac. 523, 67 Pac. 951; *Kendrick's Estate, supra.*) The foregoing authorities clearly indicate what facts the courts uniformly require to be proven before they will hold a testator is afflicted with an insane delusion. We call the .court's attention to the notes appended to the following cases: *Dibble* v. *Currier*, Ann. Cas. 1916C, 5–21; *Carnahan* v. *Hamilton*, Ann. Cas. 1916C, 26, 27; *Coffey* v. *Miller*, Ann. Cas. 1916C, 32; *Alexander's Estate*, Ann. Cas. 1916C, 34; *Slaughter* v. *Heath*, 27 L. R. A. (n. s.) 1, 110; *MacCrellish Estate*, L. R. A. 1915A, 443, 464.

Assuming it had been shown in this case that the testator was at one time afflicted with an insane delusion as to the intention of his daughter, there is no evidence in the record showing, or tending to show, that the testator was possessed of this insane delusion at the time he made the will, or that it influenced him in any way in making such will. (*In re Merriman's Appeal*, 108 Mich. 454, 66 N. W. 372; *Stull* v. *Stull*, 1 Neb. (Unof.) 380, 389, 96 N. W. 196, 200; *Philadelphia Trust etc. Co.* v. *Drinkhouse*, 17 Phila. (Pa.) 23, 41 Leg. Int. 164.)

It is true whenever insanity of a permanent nature is once shown to exist it is presumed to continue until the presumption is overturned by a countervailing evidence, but this is not the rule which governs where the insanity is of a temporary character, and our court did not so hold in the case of *Murphy's Estate*, 43 Mont. 353, 373, Ann. Cas. 1912C, 380, 116 Pac. 1004.

MR. JUSTICE COOPER delivered the following opinion:

This action was brought to revoke the will of William J. Redfern upon the ground that he was suffering from an insane delusion. He was more than eighty years old when the will was executed. The heirs consisted of a son, the defendant, and the plaintiff. The wife of deceased died at the birth of defendant, the plaintiff then being a year and

[64 Mont. 49.]

a half old. The two children were brought up in the neighborhood by relatives of the father, with whom the plaintiff lived until she was twenty years of age, when she moved to Helena and worked as a cook for something like ten years. She then moved to Seattle, Washington. In 1910 she met Donald Matheson, and was married to him. They lived in Seattle until 1913. In the latter part of 1911 the testator visited his daughter at her home, and remained there for a period of three months. His health improved so much during his visit that he concluded to sell his property in Montana and return to Seattle to live. In February, 1912, he so returned, but instead of selling his property wrote the plaintiff suggesting that she and her husband come to Montana and rent and operate his farm. They decided to accept the offer and came to the home of the deceased in Madison county. Soon after their arrival they rented the farm, and later signed a written lease therefor. On the ranch they lived until about the 1st of August. They then sold the lease to another person and Matheson went to work in a mine near by. For a period of three weeks thereafter the plaintiff remained on the ranch and acted as housekeeper for the family to whom the lease had been transferred. From there she went to the home of her uncle, where she stayed until the September following. In the summer of 1913 the deceased suffered from frequent headaches. In September of that year, accompanied by a neighbor, he drove a horse and buggy to the neighboring town of Laurin for the purpose of attending the funeral of an acquaintance of the family. In getting out of the rig at Laurin deceased fell unconscious to the ground, and was taken to a hotel and put to bed, where the plaintiff found him on her arrival half an hour later. At the suggestion of the defendant the plaintiff accompanied her father to his cabin, a distance of about half a mile from his ranch, and nursed and cared for him during his illness, which lasted for a period of something like three months and a half. One morning during this period she set before him

some apple jelly she had made some time previous, upon the top of which sugar had crystallized. Deceased picked up the glass, looked at it, and asked the plaintiff what was in it. Upon her telling him it was sugar, he immediately pushed it from him, remarking that it had strychnine in it. To convince him of his mistake, she skimmed off the crystallized portion, spread it upon a slice of bread, and ate it in his presence. He nevertheless persisted in his refusal to eat it in her presence. After he had somewhat recovered from his illness, and the plaintiff was living on the ranch of Mr. Moran in the neighborhood, she made some doughnuts upon which she sprinkled granulated sugar. She took them to his cabin, but he refused to eat them, saying it (referring to the sugar) looked like poison. To convince him that it was not poison, she ate one of the doughnuts in his presence, but he still refused to eat them, telling her at the same time to take them away, which she did. Before the accident she took him milk to drink every night and morning, and, because of headaches, and his inability to cook for himself, made soups and took them to him at his cabin. The plaintiff lived with her husband upon the Moran ranch from January to the latter part of March, when they left for Butte, going from thence to Portland and later to San Francisco. From that time to his death she wrote occasionally to her father. He answered her letters in a friendly tone, giving no evidence of resentment on account of her supposed attempt to give him poisoned food. She also testified that they sold the lease and left the ranch because conditions had been misrepresented to them—by whom she was not asked—and because they could make nothing out of it; that she took no part in the controversy between Matheson and deceased over the signing of the lease, and that her father displayed no ill feeling toward her in consequence of these differences over the ranch; that after he had recovered from his illness, and was able to leave the house, she cooked articles of food for him and took them to his cabin. These he did not eat in her presence.

Esther Rudy Widner, a neighbor, testified that she was thirty-one years of age, had resided near the deceased all her life, and had known him for seventeen years; that in the month of December, 1913, after he had somewhat recovered from his illness, he came over to her house, and during his visit, in a general conversation, remarked that children "were all right when they were little, but when they grow up you want to look out for them." She then asked him, "How is that?" to which he responded, "That they don't try to poison you like Lida did me" (referring to the plaintiff). She further testified: "Q. What else did he say? A. I answered, 'Why, she did not try to do that, Mr. Redfern,' and he said, 'Indeed she did.'" She testified further that in August, 1917, she asked deceased where the plaintiff was, and that he stated in response to her question, "She is down on the coast some place," he guessed, and he, "hoped she stayed there, for he felt safer when she was a long ways off."

In answer to the inquiry of counsel as to when she first [1] learned of the terms of the will, the plaintiff stated that her brother told her in a letter. This letter the plaintiff offered in evidence upon the issue of the delusion, supplemented by an oral explanation given by the defendant soon after the commencement of the action. The letter was ruled out upon the ground that it was immaterial, irrelevant and incompetent, hearsay, and the declaration of a third party, the court remarking that it was hearsay, but that the facts could be proven by the defendant himself, who was present in court. The defendant was not sworn as a witness. The will was executed January 2, 1918. The testator died March 7, following. The will was admitted to probate, and on April 23, Martin Johnson, one of the defendants, was appointed executor.

The material portion of the letter excluded is as follows:

"Father had Johnson come up to the cabin some time last winter and make his will. Some time after he showed me the will. He left you $2 and everything else to me. I told him

then that he ought to leave you more than that. He answered me and said that I did not know everything. Later he told me why. He told me what you tried to do. I must say it was hard to believe. I can write no more.

"Your brother,

"John."

The court also excluded plaintiff's offer to show by the plaintiff that the defendant, John C. Redfern, in a conversation had with. him at Laurin, Montana, during July or August, 1918, in the presence of her lawyer, H. P. Beckett, that the deceased had told him that the reason he left his daughter a bequest of only two dollars was that his daughter had tried to poison him.

At the close of the evidence for the plaintiff, defendant's motion to instruct the jury to return a verdict in his favor was sustained because the plaintiff had failed to make out a *prima facie* case. From the judgment and order denying a new trial, the plaintiff has appealed.

Counsel for both sides rely upon the opinion of Sir John Nicholl defining monomania and the text-writers accepting *Daw* v. *Clark*, 1 Add. Ecc. 279, 3 Add. Ecc. 79, as the leading case upon the subject. (1 Alexander's Commentaries on Wills, p. 466; 1 Schouler on Wills, 5th ed., Chap. VIII.) Exhaustive discussions of the question will be found in *Broughton* v. *Knight*, 6 Moak, 349; *American Seamen's Friend Society* v. *Hopper*, 33 N. Y. 624; *Friedersdorf* v. *Lacy*, 173 Ind. 429, 90 N. E. 766; *Bohler* v. *Hicks*, 120 Ga. 800, 48 S. E. 306; *In re Scott's Estate*, 128 Cal. 57, 60 Pac. 527; *In re Kendrick's Estate*, 130 Cal. 360, 62 Pac. 605; *In re Skinner's Will*, 40 Or. 571, 62 Pac. 523, 67 Pac. 951; notes to *Dibble* v. *Currier*, Ann. Cas. 1916C, pp. 5–21.

In 1 Schouler on Wills, section 146, the author has this to say: "On the whole, the essence of an insane delusion is that it has no basis in reason, and cannot by reason or evidence be dispelled in the slightest. It is thus capable of being

cherished side by side with other ideas utterly inconsistent with it."

In *Murphy* v. *Nett*, 43 Mont. 353, Ann. Cas. 1912C, 380, 116 Pac. 1004, is this language: "Lunacy or insanity, if of a [2] general, habitual, or permanent nature, once shown to exist, is presumed to continue until the presumption is overturned by countervailing evidence. This rule is recognized by the courts generally. * * * Where its existence is made to appear the presumption referred to attaches; for we know from experience that the condition usually continues." To the same effect are Alexander on Wills, p. 466; *In re Thayer's Estate*, 188 Mich. 261, 154 N. W. 32; *American Seamen's Friend Society* v. *Hopper*, 33 N. Y. 624; *Ballantine* v. *Proudfoot*, 62 Wis. 216, 22 N. W. 392; *Bradley* v. *Onstott*, 180 Ind. 687, 103 N. E. 798.

The evidence offered and rejected was admissible because the defendant was the sole beneficiary under the will, and a party to the proceeding to set it aside. (Section 10531, Rev. Codes 1921; *Murphy* v. *Nett, supra;* Underhill on Wills, sec. 163; Alexander on Wills, sec. 373; 1 Schouler on Wills, sec. 195; Page on Wills, sec. 401; *Egbers* v. *Egbers*, 177 Ill. 82, 52 N. E. 285; *Lyman* v. *Kaul*, 275 Ill. 11, 113 N. E. 944; *Brainerd* v. *Brainerd*, 259 Ill. 613, 103 N. E. 45; *Potter's Appeal*, 53 Mich. 106, 18 N. W. 575; *Zibble* v. *Zibble*, 131 Mich. 655, 92 N. W. 348; *Fay* v. *Feeley*, 18 R. I. 715, 30 Atl. 342; *Shailer* v. *Bumstead*, 99 Mass. 112; *Lane* v. *Moore*, 151 Mass. 87, 21 Am. St. Rep. 430, 23 N. E. 828; *May* v. *Bradlee*, 127 Mass. 414.)

In *Potter's Appeal, supra,* the supreme court of Michigan say: "Admissions made by a party to the record, whether upon the witness-stand or elsewhere, relative to matters material to the issue, may be given in evidence by the opposite party, and persons hearing the admissions * * * may be called to prove what was said. And if a person present at the time the admission was made reduces it to writing in the exact language used, and testifies to that fact, and there is no question as to its correctness, I can see no objection to introducing the writing itself in evidence. The object of all

testimony is to elicit the exact truth, and that evidence is the best from which all possibility of error is eliminated.''

There the contestant introduced the court reporter, who took the shorthand notes of the testimony of the sole beneficiary under the will given in the probate proceedings. The exclusion of the evidence was one of the rulings upon which the case was reversed. This decision was affirmed in *Zibble* v. *Zibble, supra.* Statements of this character have also been held admissible as declarations against interest. (*Lyman* v. *Kaul, supra; Brainerd* v. *Brainerd, supra; In re Rick's Estate,* 160 Cal. 467, 117 Pac. 539.) In the case last cited the supreme court of California held that ''The admissions and declarations against the interest of the sole beneficiary were admissible to establish any fact in issue upon the validity of the will which they have a tendency to establish.''

With this evidence there was enough produced to take the case to the jury for its consideration.

The judgment and order appealed from are reversed, and the cause is remanded to the district court, with directions to grant a new trial.

MR. JUSTICE HOLLOWAY: I concur in the result.

MR. JUSTICE GALEN, J., Concurring: I concur in the result reached. The grounds upon which the will was contested were: That (a) the testator was, on the second day of January, 1918, when he ''executed the purported and pretended will, * * * not of sound mind and memory and was not in any respect competent or capable to make a last will and testament''; and (b) that at the time of the execution of the ''purported and pretended will,'' the testator ''was acting under the undue influence of John C. Redfern, the son of deceased.''

There was a complete failure of proof to support the [1] second ground of the contest, *i. e.,* undue influence; and and, as to the first cause, while the proof was slight, yet preju-

dicial error was committed in the exclusion of the letter written by John C. Redfern, dated March 20, 1918, shortly after his father's death, explaining to the contestant, his sister, the reason the testator gave for disinheriting her, and the offered testimony by the contestant that in July, following the death of the testator, the defendant, John C. Redfern, the sole beneficiary under the will, stated to the contestant in the presence of her lawyer, H. P. Beckett, that the testator had said "the reason why he left his daughter * * * a bequest of only two dollars was that" she "had tried to poison him." These were declarations against interest, and were properly admissible. They were the only children of the deceased, and the beneficiary, as a party in interest, was seeking to sustain the will, so that his declarations in disparagement of the will, based upon alleged declarations made by the testator to him, were properly admissible. With this additional evidence, in my opinion, a case sufficient to go to the jury was made; though not strong, clear, or convincing, yet based on all the facts and circumstances, it was properly the jury's province to say whether the testator was competent when he executed the will.

I have no objection to the general principles of law enunciated by Mr. Justice Cooper on the subject of insane delusions except that I do not now and never have approved of the use of the word "habitual" by Mr. Chief Justice Brantly in the case of *Murphy* v. *Nett*, 43 Mont. 353, Ann. Cas. 1912C, 380, 116 Pac. 1004, in discussing the presumption existing concerning "lunacy or insanity of a general, habitual, or permanent nature once shown to exist." The word "habitual" presupposes intelligence, and was therefore improperly used in that decision. It will be noted that I was of counsel in the *Murphy Case*.

MR. JUSTICE FARR and HONORABLE ROY E. AYERS, District Judge, sitting in place of MR. CHIEF JUSTICE BRANTLY, disqualified, concur in the views expressed by MR. JUSTICE GALEN.