398 P.2d 616 (1965)
In the MATTER of the Estate of Minnie BODIN, Deceased.
Arnold HANSON, Elias Haine, and Marie Haugrud, Plaintiffs-Contestants and Respondents,
v.
Ludvig WILLIAMS and Esther Hansen, Co-Executors of the Estate and Will of Minnie Bodin, Deceased, Ludwig Williams, Esther Hansen and Emma Lind, as Devisees under the Will of Minnie Bodin, Deceased, Defendants-Contestees and Appellants.
No. 10667.
Supreme Court of Montana.
January 15, 1965.
Rehearing denied February 17, 1965.
*617 Kline & McCormick, Glasgow, William A. McCormick (argued), Glasgow, for appellants.
Tipp & Hoven, Missoula, Vernon Hoven (argued), Missoula, for respondents.
CASTLES Justice.
This is an appeal from an order revoking the probate of the will of Minnie Bodin, the will having been made on March 17, 1962. The case was tried before a jury, and the issue submitted to the jury by special interrogatories was whether or not Minnie Bodin was competent to make a will at the time of its making. The jury answered the interrogatories in the negative.
Thereafter, the district judge made his order revoking the probate of the will and letters testamentary. The proponents of the will have appealed.
The proponents of the will, appellants here, are Ludvig Williams, Esther Hansen and Emma Lind. Ludvig Williams and Esther Hansen, brother and sister, are named Executors in the will. They are distantly related to the deceased, having been children of a cousin of the deceased. Emma Lind is a niece. These three proponents have equal shares of the residuary of the estate as hereinafter shown by the will.
The status of the parties, contestants and proponents, will be revealed in part by a quotation of part of the will. It stated:
"II. I acknowledge the existence of certain relatives, but exclude all except those mentioned herein.
"III. I give, grant and devise to my brother, Elias Hinie, of Minot, N.D., the sum of $500.
"IV. I give, grant and devise unto my sister, Mary, of Norway, the sum of $500.
"V. I give, devise and bequeath the remainder of my estate of every kind and nature, including real property and personal property unto Esther Hansen, Ludvig Williams, Emma Lind, and Arnold Hansen, share and share alike.
"VI. In the event my real estate, consisting of farm land, should be sold, I request *618 that Orin Olson of Westby, Montana be given the privilege of meeting any bid on the real estate."
The contestants of the will are Elias Hinie, a half-brother of the deceased and a legatee of $500 under the will; Marie Haugrud, a sister in Norway, the one named as Mary in the will and a legatee of $500; and Arnold Hanson, a one-fourth devisee of the remainder of the estate. Arnold Hanson is a step-son of deceased; and strangely, if his contest is successful he will receive nothing.
Arnold Hanson, the step-son, had been raised by the deceased but never formally adopted.
Elias Hinie, the half-brother, is a man 86 years of age.
The will was made by the deceased Minnie Bodin, under the following circumstances. Minnie Bodin entered the hospital on February 24, 1962, suffering from cancer which she had had for about six years. She remained in the hospital until her death on March 19, 1962. In the morning of each day, and at other times, she was given a narcotic to relieve pain. The effect of this medication would last some three or four hours. The last medication, on March 17th, the date of the will, was administered at about 1:00 p.m.
Esther Hansen, a cook at the hospital where Minnie Bodin was a patient, and who also is one of the proponents previously described, called her brother, Ludvig Williams, at Minnie's request to come to the hospital. This call was sometime between 5:00 and 6:00 p.m. on March 17th.
Ludvig Williams went to the hospital, arriving sometime after 6:00 p.m. According to his testimony, Minnie Bodin wanted to make a will. Whereupon Ludvig called Loren O'Toole, an attorney, to come to the hospital.
Loren O'Toole arrived at about 7:00 p.m. When he arrived, O'Toole stopped at the nurses' station and talked to the nurse on duty, one Mildred Espeland. He asked the nurse if she thought Minnie Bodin was capable of executing and signing a will. The nurse informed O'Toole that Minnie had had no medication since 1:00 p.m., and that she, the nurse, thought Minnie could make a will.
Loren O'Toole then went to see Minnie Bodin. Esther Hansen and Ludvig Williams were there at the bedside, but Mr. O'Toole asked them to leave. Mr. O'Toole had not known Minnie Bodin before this occasion. He talked to no one else but Minnie and discussed with her the terms of the will. He testified that her mind was alert, that he could understand her, and that she was responsive to questions. Minnie told him about her half-brother, Elias Hinie; her sister Mary in Norway; her step-son Arnold Hanson, as well as about Ludvig Williams, Esther Hansen and Emma Lind. She also told Mr. O'Toole that she had no living children and that she had a child who died many years ago. In addition, she described her property and gave some details and explanations of her bequests or lack of them. Minnie also told Mr. O'Toole that she wanted the will prepared that same night.
Mr. O'Toole thereupon went into the nurses' station, borrowed paper and a typewriter and prepared the will. He returned to Minnie's room, read the will to her, handed it to her and asked if that was her intention, if she had any questions. She put on her glasses and looked at both pages. It was then declared by her as her will and completed with a nurse, Mildred Espeland, and Mr. O'Toole as subscribing witnesses.
More will be related later concerning the testimony and details as they relate to the problems presented.
Although ten specifications of error are set forth, we find but one question need be answered. That is, was there presented evidence of incompetency to make a will at the time of the making, sufficient to uphold the jury's answer to the interrogatory and the order of the district court?
First, we shall set forth the law in Montana applicable. The will had been admitted to probate and the presumption is *619 that the deceased was competent and of sound mind. (In re Murphy's Estate, 43 Mont. 353, 116 P. 1004; In re Benson's Estate, 110 Mont. 25, 98 P.2d 868.) At this point it becomes incumbent upon the contestants to overcome the presumption by a preponderance of the evidence (In re Murphy's Estate, supra) or as stated in the case of In re Choiniere's Estate, 117 Mont. 65, 156 P.2d 635, the evidence must be clear and satisfactory to overcome the presumption of due execution of the will (including the mental capacity of testatrix). (See also In re Silver's Estate, 98 Mont. 141, 158, 38 P.2d 277.)
The same rule is expressed in Estate of Dillenburg, 136 Mont. 542, 349 P.2d 573, as follows:
"In considering this question, we must view the evidence in light most favorable to contestant since the jury found in their favor and we must consider that as proved which the evidence tends to prove, and if there be in the record substantial evidence sustaining the finding of incompetency we must sustain the court's action in submitting the cause to the jury and sustain the finding of the jury and the judgment based thereon." (Italics supplied.) The above rule was pronounced in the light of the distinction made later as follows:
"Proponents question the sufficiency of the evidence of incompetency at the precise time of making the will. As before noted, the evidence of incompetency related to times before and after the will was made and none was directed to the precise time when the will was made.
"But the evidence of the mental condition shortly before and shortly after the execution of the will is important from which inferences may be drawn to rebut the presumption of competency. In re Cissel's Estate, 104 Mont. 306, 66 P.2d 779; 2 Page on Wills (3d ed.), sec. 792, p. 553, et seq.
"Here the evidence of incompetency was not such as to show that it was intermittent or occasional, in which case a different rule applies, as pointed out in the cases of In re Murphy's Estate, 43 Mont. 353, 116 P. 1004, and In re Estate of Redfern, 64 Mont. 49, 208 P. 1072, relied on by proponents."
We have defined what is meant by the word competent. We have stated:
"`Competent' means capable, qualified, or fit (Webster's New International Dictionary); possessing legal power or capacity (United States v. Sischo [D.C.Wash.] 262 F. 1001). And a testator is competent if he is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of his property and his relations to persons having claims on his bounty whose interests are affected by his will. In re Smith's Estate, 200 Cal. 152, 252 P. 325. The `testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them.' Page on Wills (2d Ed.) § 141." In re Bielenberg's Estate, 86 Mont. 521, 528, 284 P. 546, 548; In re Cissel's Estate, 104 Mont. 306, 66 P.2d 779.
We shall return now to the evidence in this case to ascertain whether there be substantial evidence of incompetency.
Minnie Bodin, the deceased, was 79 years of age. She was old, sick and in pain. It is made very clear by all of the testimony that her mind was good, except that when under medication she was "confused," "foggy," "changeable," "forgetful," as variously described by the witnesses. It may be that the above statement that Minnie's mind was "good" may be challenged, insofar as what is meant by "good," but it does seem clear from all of the witnesses that she was "competent" as previously defined except during periods of medication; or, put another way, that if incompetency was shown, it was occasional or intermittent, and not of such a nature that the condition necessarily continues.
*620 We shall examine briefly the testimony of each witness to see if there was any substantial evidence of incompetency at the time of the making of the will. We are aware that, as respondents contend, such evidence at the exact time may be impossible of production and that if incompetency be of a general, habitual, or permanent nature, whether it be from general senility or otherwise, be shown before and after the making of the will, there may arise sufficient evidence of incompetency to go to the jury.
Arnold Hanson testified that on February 16, Minnie was "pretty bad," couldn't recognize him on awakening, but when he brought her home from the hospital she was in good mental condition to the best of his knowledge. Arnold Hanson never saw Minnie again, this being about one month prior to the execution of the will.
Ernest Olson, a long time acquaintance and a neighbor of Minnie Bodin, stated that after Minnie returned to her home on February 19 her mind was changeable, she was forgetful, worried about going broke, and often you couldn't rely on what she said. He admitted that he couldn't tell about her mental condition, because as he put it, "I didn't pay too much attention to her to be honest with you."
Mrs. Ernest Olson testified that at the same time, about one month prior to the making of the will, Minnie would sometimes think she had taken her pills without actually having done so. Also that on some days Minnie wasn't "too bad" and some days "wasn't so good;" or again, "some days were worse than other days" with reference to her memory of taking her pills.
Doctor Stoner, the attending physician, testified that at times Minnie had medication she would be confused; that the effects of demeral usually lasts three or four hours, although depending on the condition of the patient, could last longer. He stated that at 1:00 P.M. on the day of the execution of the will, Minnie had codeine that he wouldn't expect to have much influence six hours later. When asked directly, Dr. Stoner stated he would not know Minnie's condition at the time of making the will. It seems pertinent to observe that Dr. Stoner, except as to periods of medication, never questioned Minnie's competency, in fact, observed that she remained alert.
Mrs. Iverson, a friend and acquaintance, saw Minnie on Friday night, one day preceding the making of the will, and observed that Minnie was "dopey," couldn't carry on a conversation, couldn't recognize her, and "her eyes were dim." She testified that there was a decline in Minnie's mental ability to concentrate, and that she could not concentrate properly.
Mrs. King stated that on the afternoon of the will, this being during the period of medication, Minnie did not recognize her.
Elias Hinie, the half-brother, a man of 86 years of age, had visited Minnie about two weeks before the making of the will for several days in the hospital. They visited daily, they understood each other, had good conversation. Nowhere in his testimony, although he is a contestant, did he ever refer to Minnie as being incompetent during his visits.
Taken together, the testimony of these witnesses simply never made out a case of incompetency except during periods of medication. Certainly not under the rules expressed in the case of In re Murphy's Estate, supra, where it was said:
"* * * But to cases of intermittent or occasional insanity it can have no application, because in the very nature of things the idea of continuity is excluded. So that, when this is the condition, proof of its existence at one time raises no presumption that it existed either at an antecedent or subsequent time. The question for determination is: Was the testator of sound mind at the time the will was executed? If he was, his precedent and subsequent condition is immaterial. [Citing authority.]" 43 Mont. 373, 116 P. 1009.
That Minnie Bodin was a sick old lady, often times in great pain and under the influence of drugs there was no doubt. When she was under the influence of drugs she *621 was drowsy, uncommunicative, and often times confused. But the evidence goes no further, and it is not the substantial evidence required to overcome the presumption of competency.
Going further, the respondent urges the rule of In re Carroll's Estate, 59 Mont. 403, 410, 196 P. 996, as follows:
"* * * In our opinion, the word `incompetent,' when applied to an individual's incapacity to make a will, should be construed to apply to any person who, whether insane or not, is, by reason of immaturity, old age, disease, weakness of mind, or from any other cause, unable to understand what property he has, the relationship he bears to those who would naturally be the objects of his bounty and what disposition he may be making of his property at the time."
In the instant case, Minnie knew her property and related it to Mr. O'Toole, even as to details concerning a tenant. She specifically gave reasons why she was making bequests of relatively small amounts to her brother and sister. Then, she disposed of in one-fourth shares the remainder of what appears to be an estate of some $10,000 to the four people, who it is shown are either distantly related, and close acquaintances, or as in Arnold Hanson's case, a step-son, or as in the case of Emma Lind, a niece. We cannot say that such a disposition, under the circumstances, is so unnatural as to raise a suggestion of unnaturalness as to the objects of her bounty, as these terms are used in In re Carroll's Estate, supra.
There being no substantial evidence of incompetency at the time of the making of the will, it was error to allow it to go to the jury.
For the foregoing reasons, the order revoking the probate of the will of Minnie Bodin, is reversed, and the matter returned to the district court for probate of the will.
JAMES T. HARRISON, C. J., and JOHN CONWAY HARRISON, DOYLE, and ADAIR, JJ., concur.