No. 99-534

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 200

300 Mont. 469

8 P.3d 88

IN THE MATTER OF THE ESTATE OF

GERTRUDE E. PRESCOTT,

a/k/a SCOTTY PRESCOTT, deceased.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Thomas M. White, Sedivy, White & White, P.C., Bozeman, Montana

For Respondents:

Calvin M. Braaksma, Landoe, Brown, Planalp, Braaksma & Reida, P.C.,

Bozeman, Montana

Brian M. Morris, Goetz, Baldwin & Dolan, P.C., Bozeman, Montana

---

Submitted on Briefs: December 29, 1999

Decided: July 20, 2000

Filed:

---

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶The Appellant, William Prescott Putman, brought this action against the estate of his mother, Gertrude E. Prescott, in the District Court for the Eighteenth Judicial District in Gallatin County. Putman sought to invalidate Prescott's will on the basis that she either lacked testamentary capacity at the time she executed her will or that

Putman was an omitted child pursuant to § 72-2-332(3), MCA. The District Court awarded summary judgment to the Personal Representative, Sherman Veltkamp, and Museum of the Rockies, the residuary devisee. Putman appeals the District Court's award of summary judgment. We affirm the judgment of the District Court.

2. ¶The following issues are raised on appeal:

3. ¶1. Did the District Court err when it concluded that Putman had offered no evidence that he had been excluded from his mother's will because she believed he was dead?

4. ¶2. Did the District Court err when it concluded that Putman had offered no credible evidence that Prescott lacked testamentary capacity when she executed her will on April 1, 1985?

## FACTUAL BACKGROUND

1. ¶Gertrude E. Prescott, known as "Scotty" to her friends, was born in Massachusetts on July 25, 1923. She attended high school in Wisconsin and graduated in 1941. On May 25, 1944, Prescott enlisted in the Women's Army Corps. She was honorably discharged on October 19, 1945. At that time she received a 30 percent service-related disability rating due to an anxiety disorder caused during her service. She retained her disability impairment rating for the remainder of her life.

2. ¶On June 7, 1946, Prescott married Howard Putman, and they moved first to North Dakota and then to Montana. On November 13, 1949, she gave birth to her only child, William Prescott Putman. Following Putman's birth, Prescott attended Montana State College. In 1952, Howard became ill and moved to California with Putman. Prescott remained in Montana where she continued her classes at Montana State College and subsequently graduated with an Honors Degree in Agriculture in 1953.

3. ¶At some point during her years at MSU, Prescott learned that Howard had previously been married and that the dissolution of that marriage had not been completed at the time she married him. In 1954, Prescott filed for and was granted an annulment of her marriage to Howard. Following the annulment, Putman remained with his father in California.

4. ¶Prescott remained in contact with Howard and Putman for a short period of time following the annulment. Two letters written by her were received by Howard in 1954. One letter asked Howard to "please give my love and remembrance to Little Bill" and the other letter closed with "a big hug for Bill." Following the letters received in 1954, there is no evidence of any other contact among Prescott, Howard

and Putman. Putman has no independent recollection of his mother nor did Putman ever attempt to contact his mother during the remaining 42 years of her life.

5. ¶Following her graduation from Montana State College, Prescott moved to a ranch near White Sulphur Springs, Montana. She lived alone in a small cabin with no electricity and no running water. She lived a simple life and supported herself with income received from the ranch for nearly 30 years.

6. ¶In 1962, Prescott received a letter from Charles Linley, her lawyer at the time, in which Linley mentioned that he had been informed that she had a son. However, there is no indication of the source for Linley's information or whether he had ever discussed Putman with his mother.

7. ¶In the early 1960s Prescott donated various items to the Montana State College and the McGill Museum (now known as the Museum of the Rockies). These items included 500 pieces of furniture, household items, glass, porcelain, copper and pewter ware, as well as trunks and boxes of miscellaneous items. In August 1964, she wrote a letter to Leon Johnson, then President of Montana State College, describing her future intentions:

I look forward to the time when most of its [her ranch's] earnings will go to help Montana State College, the McGill Museum and the Endowment and Research Foundation. It is to this end that my every effort and plan is directed.

1. ¶Prescott suffered a stroke in 1981 that resulted in the partial paralysis of her right side. Following her stroke, she spent several months in hospitals and rehabilitation centers. In 1983, she suffered an acute appendicitis and during the surgery she went into cardiac arrest, which left the doctors unable to successfully complete the surgery. The antibiotics prescribed to minimize the possibility of infection caused renal failure. As a result of her health problems, Prescott sold her ranch in 1983.

2. ¶In 1984, Prescott moved into the Hillcrest Retirement Center in Bozeman, Montana. She later moved to the Churchill Retirement Home in Amsterdam, Montana, but after a short time, she moved into her own apartment in Bozeman where she lived until her death in 1996.

3. ¶In 1984, Prescott agreed to the appointment of Sherman Veltkamp, as her conservator. He had previously advised her regarding her taxes and investments. According to Veltkamp, he suggested to Jim Moore, Prescott's attorney, that she execute a power of attorney to allow someone the authority to assist her in her investment and money management decisions. In response, Moore suggested that a

conservatorship would be a better alternative, and Prescott consented.

4. ¶According to Veltkamp, Prescott handled her own finances and wrote her own checks to pay her bills. Veltkamp limited his role to reviewing Prescott's bank statements for unusual expenditures and ensuring that she paid her bills regularly.

5. ¶On April 1, 1985, at the age of 61, Prescott executed her will which had been drafted by her attorney, Jim Moore. Moore and Prescott had met initially when she was studying agriculture at Montana State College. They became reacquainted following her purchase of her ranch. Moore was also involved in the ranching community in central Montana. Following Prescott's move to Bozeman in 1984, she and Moore resumed their friendship. Moore testified that when he assisted Prescott with her will he followed his standard procedure. He drafted a will based on conversations with her during which they discussed how she wanted to dispose of her estate. He then met with her to explain the provisions of the will and to verify that the will would dispose of her estate in the manner she intended. Moore testified that he "would not have allowed her [Prescott] to sign the will" if he had doubted her testamentary capacity.

6. ¶Prescott's will included a specific bequest of the profits from the sale of her ranch to the Montana State University Endowment and Alumni Foundation and left the remainder of her estate to the Museum of the Rockies. Her conservator, Veltkamp, was named as her personal representative. Prescott's will makes no mention of her son Putman, nor of any other family member. Although Moore has no recollection of any discussion with her about her son, his chronologically ordered file contained an undated note made between his December 1985 and January 1986 entries, which stated the following:

Scotty was married to a man named Putman. Marriage annulled in Gt. Falls in 1948 or 1949. Had a son named William Prescott Putman. Taught at Ferdig and Sunburst during marriage. Married four years.

1. ¶In 1991, Prescott asked Moore to make certain revisions to her 1985 will. None of the requested changes affected the substantive portions of the will. They were stylistic changes, which included the addition of the statement that "the line of succession for this branch of the Prescott family ends with me." Moore drafted a revised will in accordance with Prescott's requests, however, she did not execute the revised will.

2. ¶Prescott died on November 1, 1996, at the age of 73, at the Veteran's

Administration Medical Center in Fort Harrison. Following her death, Moore published her obituary in several local newspapers. Moore received a call from Boyd Iverson, a former neighbor and friend of Prescott's who advised Moore that she had a son. Moore and Veltkamp found Putman living in California and advised him of the proceedings of his mother's estate. Prescott's will was admitted to probate in formal proceedings commenced by Veltkamp on December 2, 1996.

3. ¶On July 17, 1997, Putman filed a Petition for Allowance of Claim in which he requested his intestate share of Prescott's estate as either an omitted child pursuant to § 72-2-332(3), MCA, or as an intestate heir because the will was void due to her lack of testamentary capacity. The residuary devisee, Museum of the Rockies, intervened in this matter on January 13, 1998. On December 15, 1998, Veltkamp and the Museum of the Rockies filed motions for summary judgment. On July 13, 1999, the District Court granted their motions. Putman appeals from the District Court's order granting summary judgment.

## STANDARD OF REVIEW

1. ¶Our standard of review on appeal from summary judgment orders is de novo. *See Motarie v. Northern Montana Joint Refuse Disposal District* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156. We review a district court's summary judgment to determine whether it was correctly decided pursuant to Rule 56, M.R.Civ.P., which provides that summary judgment is only appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See Motarie*, 274 Mont. at 242, 907 P.2d at 156.

2. ¶The fact that a nonmoving party interprets facts differently from the moving party does not preclude summary judgment. *See Scanlon v. National Assoc. of Ins. Comm'rs* (1994), 265 Mont. 184, 189, 875 P.2d 340, 343. Additionally, mere conclusory or speculative statements will not preclude summary judgment. *See Richland Nat'l Bank & Trust v. Swenson* (1991), 249 Mont. 410, 418, 816 P.2d 1045, 1050.

3. ¶The contestant of a will bears the burden of proof. *See* § 72-3-310; *Estate of Lien* (1995), 270 Mont. 295, 300, 892 P.2d 530, 532.

## DISCUSSION

## ISSUE 1

1. ¶Did the District Court err when it concluded that Putman had offered no evidence that he had been excluded from his mother's will because she believed he was dead?

2. ¶Putman asserts that pursuant to § 72-2-332(3), MCA, he is entitled to share in his mother's estate because she excluded him from her will solely because she mistakenly believed he was dead. Putman contends that the record includes evidence that Prescott believed she was the last of the Prescott line at the time she executed her will, and that evidence creates a material question of fact about whether she had a mistaken belief that her son was dead at the time she executed her will.

3. ¶In response, Veltkamp and the Museum contend that there is no evidence that Prescott actually believed that Putman was dead or that such a belief was the reason she did not provide for him in the will. They point out that the evidence reveals several friends and acquaintances of Prescott knew of the existence of her son and that Putman has failed to produce any evidence that her friends acquired the information from any source but her. The Personal Representative and the Museum also note that Putman acknowledged in his summary judgment brief that "there is no indication whether Prescott believed her child, William, to be dead . . . ." Further, they point out that whether or not she believed him to be dead in 1985 it had been her intention to leave her estate to the college and museum since 1964. Therefore, whatever her belief, it was not the reason for her disposition of her estate.

4. ¶Section 72-2-332(3), MCA, entitled "Omitted children," provides the following:

If at the time of execution of the will the testator fails to provide in the testator's will for a living child solely because the testator believes the child to be dead, the child is entitled to share in the estate as if the child were an omitted after-born or after-adopted child.

Pursuant to this statute, Putman must prove two elements: (1) that Prescott believed he was dead at the time she executed her will, and (2) that Prescott omitted him from the will solely because she believed he was dead.

1. ¶Putman fails to present any evidence that Prescott actually believed he was dead. To the contrary, the note found in the file of her attorney, Moore, believed to have been made after the execution of her will, reveals that Prescott had a son. Boyd Iverson, her neighbor and friend, knew that she had a son. The Museum found a letter in its files dated in 1984 in which the author, Dr. Merrill Burlingame, an employee of the Museum, informed the Museum that "we first knew her [Prescott]

as Mrs. Putman, with a husband and small child." Finally, the statements made by Prescott in which she declared that she was the end of the Prescott line, were not made until six years after the execution of her will and are consistent with the manner in which she, and Putman lived their lives. They had no contact over a span of 42 years.

2. ¶Moreover, Putman did not produce any evidence to satisfy the second element of § 72-2-332(3), MCA, that he was omitted from Prescott's will solely because she believed he was dead. The record is replete with uncontroverted proof that the disposition of Prescott's estate to the MSU Endowment Fund and the Museum is consistent with the intention she stated as early as 1964 and her long history of philanthropy toward the college and the Museum, and is also consistent with the fact that she had no relationship with Putman.

3. ¶Accordingly, we conclude that Putman has failed to present substantial evidence that Prescott omitted him from her will solely because of a mistaken belief that he was dead at the time she executed her will. Therefore, we conclude that the District Court did not err when it dismissed Putman's claim which was based on § 72-2-332 (3), MCA, by summary judgment.


## ISSUE 2

1. ¶Did the District Court err when it concluded that Putman had offered no credible evidence that Prescott lacked testamentary capacity when she executed her will on April 1, 1985?

2. ¶Putman asserts that at the time she executed her will, Prescott lacked the requisite testamentary capacity due to long-term mental illness and, therefore, her will should be declared invalid. Putman contends that Prescott's history of mental illness, beginning with her 30 percent disability rating and her continuing diagnoses of mental illness throughout her life, in combination with her physical problems experienced in the early 1980s, including her stroke, cardiac arrest and renal failure, established that she lacked the necessary testamentary capacity to execute her will.

3. ¶In response, Veltkamp and the Museum assert that whether Prescott suffered from mental illness during random periods of her life is irrelevant because the issue is limited to whether she had testamentary capacity on the date she executed the will. Veltkamp and the Museum contend that summary judgment was appropriate because the only witnesses with direct knowledge testified that she was competent and Putman's expert witness concedes that he can only speculate about her

testamentary capacity on the date she executed her will. Additionally, Veltkamp and the Museum assert that the appointment of a conservatorship for Prescott does not establish testamentary incapacity.

4. ¶The test for determining testamentary capacity was set forth in *In the Matter of the Estate of Bodin* (1965), 144 Mont. 555, 560, 398 P.2d 616, 619, as follows:

[A] testator is competent if he is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of his property and his relations to persons having claims on his bounty whose interests are affected by his will. . . . The "testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and the nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them."

(Citations omitted.) Therefore, testamentary capacity requires that the testator be aware of three elements: (1) the nature of the act to be performed, (2) the nature and extent of the property to be disposed of, and (3) the objects of his or her bounty.

1. ¶Testamentary capacity is determined as of the date the will was executed, April 1, 1985 in this case, using the above test from *Estate of Bodin*, which is now well-established in Montana. *See In the Matter of the Estate of Jochems* (1992), 252 Mont. 24, 29, 826 P.2d 534, 537.

### A. Nature of the Act to be Performed

1. ¶The first element required to show testamentary capacity is that the testator was aware of the nature of the act of making her will. Prescott's attorney, Moore, testified in his deposition that she understood that she was making a will on April 1, 1985:

Q. Did you determine that she understood the nature of the act in executing her last will and testament dated April 1, 1985?

A. I am confident she knew what she was doing.

1. ¶Prescott's conservator and personal representative, Veltkamp, also testified in his deposition regarding her competency at the time she executed her will:

Q. You were aware that she was considering executing a Will in 1985?

A. No, I was not aware of that until after it was done, or perhaps a phone call from Jim Moore that it was being done.

Q. All right. Did you have any concerns as to her competency at that time?

A. No.

1. ¶No evidence was presented from any other person directly familiar with her mental condition on the date she executed her will. Putman's expert, Dr. Frank Seitz, conceded that the only element of testamentary capacity that he believed to be lacking was Prescott's knowledge of who her heirs were:

Q. Okay. Now, if Prescott knew who her heirs were, would she otherwise have testamentary capacity in your view?

A. Yes.

1. ¶Therefore, we conclude that Putman has failed to present any evidence that Prescott was not aware that she was executing a will.

### B. Nature and Extent of the Property to be Disposed

1. ¶The second element of testamentary capacity is that the testator was aware of the

nature and extent of the property to be disposed of in her will. Prescott's attorney, Moore, testified in his deposition as follows:

Q. Okay. Did you determine whether she had sufficient strength and clearness of mind and memory to know the nature and extent of her property when she executed her will in April 1 of 1985?

A. I would not have allowed her to sign the will if I didn't think so.

1. ¶In his deposition testimony, Putman's expert, Dr. Seitz, again conceded that Prescott understood the nature and extent of her property:

I really didn't see any evidence in the medical records and so on where she's having some pathological problems related to understanding what she owned. She may have some difficulties managing and needs some help there, but she did have rather detailed lists, as far as property and how to have Sherman [Veltkamp] manage it . . . .

1. ¶Therefore, we conclude that Putman has failed to present any evidence that Prescott did not know the nature and extent of her property that was disposed of by her will.

## C. Objects of Her Bounty

1. ¶The third element of testamentary capacity is that the testator was aware of the objects of her bounty. This is the primary basis for Putman's challenge to Prescott's competency and is in turn based largely on her statement to her attorney, Moore, six years after execution of the will, that "no one follows me in this line of Prescott."
2. ¶Putman's expert, Dr. Seitz, testified as follows:

Q. When do you say she couldn't make a will?

A. I would have been concerned about her making a will certainly around the time of the

stroke and thereafter.

Q. The stroke being in 1981?

A. 1981.

Q. So anytime after 1981, you would have been concerned about her testamentary capacity?

A. That's right. Now, I do have to point out that she ebbed and flowed in these abilities. It's not like she was 24 hours a day, seven days a week, unable to make some of these decisions, but what I am saying is that her cognitive abilities were impaired.

Q. So it was possible, in your view, after the stroke in 1981 on a particular day, that she could have known who her heirs were?

A. There's a possibility of that.

1. ¶The problem with Seitz's testimony is that the object of her bounty when she executed her will in 1985 was the same she had indicated it would be in her letter to Leon Johnson nearly 21 years earlier, before the stroke which he felt incapacitated her. Prescott was a graduate of the Montana State College, had donated and contributed to both institutions in the past, and had expressed her future intent to donate the proceeds from the sale of her ranch to the foundation in her 1964 letter to the president of the college 21 years prior to the execution of her will which specifically devised the proceeds from the sale of her ranch to the foundation. On the other hand, she had no contact of any kind with Putman after 1954, nor did

Putman attempt to establish contact with her at any time during the remaining 42 years of her life.

2. ¶Therefore, we conclude that Putman has failed to present any credible evidence that Prescott was unaware of the objects of her bounty.

3. ¶Additionally, we note that in *Estate of West* (1994), 269 Mont. 83, 95, 887 P.2d 222, 229, we stated that "the mere fact that a conservator has been appointed does not mean that the protected person lacks the capacity to make a will." Therefore, the fact that Prescott had agreed to the appointment of a conservator, has no bearing on the issue of her testamentary capacity.

4. ¶Accordingly, we conclude that the undisputed facts prove that Prescott possessed the requisite testamentary capacity on April 1, 1985, the day she executed her will. Therefore, we conclude that the District Court did not err when it dismissed Putman's challenge to the will on the basis that Prescott lacked testamentary capacity.

5. ¶For these reasons, we affirm the judgment of the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER