DA 08-0157

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 244

IN THE MATTER OF THE ESTATE OF

MARY AILEEN LIGHTFIELD,

     Deceased.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Richland, Cause No. DP 06-86
Honorable Katherine M. Irigoin, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Paula Saye-Dooper, Attorney at Law, Billings, Montana
Robert L. Stephens, Jr., Southside Law Center, Billings, Montana

       For Appellee:

           Thane P. Johnson, Johnson, Berg, McEvoy & Bostock, Kalispell, Montana

                    Submitted on Briefs:  December 3, 2008

                            Decided:  July 21, 2009

Filed:

            _____
                       Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Aileen Lightfield died in November 2006. She was survived by her two children, Lee Lightfield and Linda Carlsen. Each child desired probate of a different will signed by Aileen. After a hearing, the District Court of the Seventh Judicial District, Richland County, found that Aileen lacked testamentary capacity and was subject to undue influence at the time she executed both wills and denied probate to both of them, resulting in intestacy. The District Court also found that Aileen was subjected to undue influence when she made certain property transfers to Lee and set them aside. Lee appeals. Linda does not appeal.

¶2 We restate the issues as follows:

¶3 1. Did the District Court err in denying probate of a holographic will?

¶4 2. Did the District Court err in concluding that property transfers were the result of undue influence?

## BACKGROUND

¶5 The facts pertinent to this appeal, as found by the District Court, are as follows: Lee lived with his mother and father from 1979 to 1983. The elder Mr. Lightfield became ill and died in 1983. After the death of her husband, Aileen lived alone for approximately six years, until she was seriously injured. Lee then moved in with her for about 18 months, starting in the fall of 1989. Later, Linda lived with Aileen in May and June 2005.

¶6 On May 18, 2002, Aileen assigned a one-half interest in a 640 acre State Lease to Lee.

¶7 In October 2002, Lee took Aileen to see an attorney who had done work for him in order to have a will prepared for her. At that time, Aileen exhibited signs of dementia. She

had begun to forget and exaggerate, but according to Lee her mind was "still pretty steady." The attorney, Jeff Hunnes, later opined that in October of 2002, Aileen was paranoid and somewhat delusional but she probably had testamentary capacity, knew the objects of her bounty, and was oriented as to time and place. Hunnes also testified that Aileen told him Linda had stolen horses from her and had driven away her hired hand, and she did not want to give Linda anything. However, Aileen also said the Richland County Sheriff and everyone in Richland County was on drugs.

¶8 After Aileen and Lee signed a document waiving any conflict of interest between them, Hunnes drafted a living trust for Aileen dated October 18, 2002. Aileen and Lee were named as co-trustees. The trust was revocable during Aileen's lifetime and became irrevocable at her death. According to the trust instrument, the property contained in the trust passed to Aileen's estate upon her death. Later, in 2006, after a conservator was appointed, all property in the trust was re-conveyed to Aileen.

¶9 Aileen also executed a General Durable Property Power of Attorney and a Durable Healthcare Power of Attorney designating Lee as her agent.

¶10 In late October 2002, Lee called Hunnes and again told him Aileen wanted a will that left everything to him. Hunnes concluded that since he represented Aileen it would be a conflict of interest to draft such a will. He referred Lee to another attorney, Bruce Harper. Harper prepared a will for Aileen, however this will was never executed.

¶11 In November or December 2002, Hunnes called Aileen to determine if she would sign a deed transferring her real property into the living trust. Aileen did not remember him. She

3

did, however, sign such a deed. Aileen called a few days later to tell Hunnes he could record the deed transferring her real property into the trust. The deed was recorded on December 16, 2002.

¶12 On January 29, 2003, Aileen wrote to Hunnes telling him she had taken the trust documents to the Farm Service Agency office. She also said that people were going into the ditch by her house and she needed to pull them out.

¶13 On February 17, 2003, Aileen and Lee, acting as co-trustees of Aileen's living trust, executed an Oil, Gas, and Mineral Lease covering the land that was in the trust. The rent for the primary term of the lease was all paid upon the signing of the lease. On March 6, 2003, and on July 17, 2003, Aileen wrote checks payable to Lee for the total amount the trust had received as rent for the oil and gas lease. Later, the lessor under the oil and gas lease made payments to Aileen for surface damage and this money was also transferred to Lee.

¶14 On August 11, 2003, Aileen made and signed a document that could qualify as a holographic will under § 72-2-522(2), MCA, which purported to leave all of her earthly possessions to Lee and provided that Linda was to receive nothing. After Aileen's death, Lee filed a copy of this holographic will with his petition to be appointed her personal representative.

¶15 In January 2004, Hunnes received a letter from Aileen asking him to send all of her original records to the Farm Bureau Financial Services Office. Hunnes called Aileen, but she did not remember who he was, sending the letter, or signing any documents. Aileen told Hunnes that Lee was continually after everything and that Lee's wife had tried to kill her by

4

drugging her.

¶16   Hunnes also called Lee, who told him Aileen's condition had deteriorated and her insurance had been cancelled for non-payment. Lee said Aileen had been trying to get the Richland County sheriff fired. The sheriff had suggested Aileen be committed to a mental institution, but Lee did not want this to happen. At that time, Hunnes concluded that Aileen's mental capacity had deteriorated to the extent that she should not have her original documents, so he did not send them to her.

¶17   In February 2004, Lee petitioned for appointment as Aileen's guardian and conservator. Linda contested Lee's appointment. Around that time, Aileen revoked the powers of attorney that made Lee her agent.

¶18   Aileen signed another will, dated June 8, 2004, leaving 80 percent of her estate to Linda and 20 percent to Lee. However, after a hearing, the District Court found the will was actually signed June 8, 2005. This will stated that Lee received less because he was given money during Aileen's lifetime.

¶19   In April 2005, Linda took Aileen to the office of the Clerk of the District Court for Yellowstone County, where the holographic will she had executed in August of 2003 was lodged. The clerk delivered that will to Aileen and Linda. At the hearing, Phillip Carter, an attorney retained at Linda's request to draft the will dated June 8, 2004, testified that he destroyed the holographic will at Aileen's direction right after Aileen signed the June 8, 2004, will. As noted above, Lee had a copy of this holographic will, which he attempted to have admitted to probate.

5

¶20 Aileen died on November 16, 2006, at age 86. In late December 2006, Lee filed a petition to be appointed personal representative of Aileen's estate. While the title of the petition says it will be an intestate estate, Lee presented a copy of the holographic will. In January, Linda objected to Lee's petition, petitioned for probate of the will dated June 8, 2004, and to be appointed personal representative.

¶21 On January 23, 2007, the District Court ordered a hearing for the purpose of determining the validity of the two wills. The District Court ultimately found that the presumption Aileen was of sound mind when executing either will was overcome and that Aileen did not have testamentary capacity to make either will. The District Court held both wills were invalid and Aileen died intestate.

¶22 In October 2007, Linda moved to set aside certain transfers from Aileen to Lee including Aileen's one-half interest in the State Lease and the payments to Lee for rent and surface damage made under the February 2003 oil and gas lease. After a hearing, the District Court concluded that these transfers were the result of undue influence by Lee and ordered Lee to execute whatever documents necessary to transfer Aileen's interest in the State Lease to her estate, or to himself and Linda as equal co-tenants. The District Court also ordered that Linda be distributed $31,960 more than Lee from Aileen's estate, constituting one-half of the $63,920 in payments to Lee that were set aside.

¶23 The District Court entered judgment on March 11, 2008.

STANDARD OF REVIEW

6

¶24 We review a district court's findings of fact to determine if they are clearly erroneous. We examine whether the findings are supported by substantial credible evidence. The evidence is reviewed in the light most favorable to the prevailing party, and the credibility of witnesses and the weight assigned to their respective testimony are up to the trial court. We review a district court's conclusions of law to determine whether they are correct. *In re Est. of Harms*, 2006 MT 320, ¶ 12, 335 Mont. 66, 149 P.3d 557.

## DISCUSSION

¶25 *Issue 1. Did the District Court err in denying probate of a holographic will?*

¶26 Lee argues there is not substantial credible evidence to support the District Court's conclusion that Aileen lacked testamentary capacity when she signed the holographic will on August 11, 2003. He asserts the District Court misapprehended the effect of the evidence presented regarding Aileen's capacity and the circumstances surrounding the creation of the holographic will.

¶27 The test for determining testamentary capacity is:

> [A] testator is competent if he is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of his property and his relations to persons having claims on his bounty whose interests are affected by his will . . . . The testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and the nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them.

*In re Bodin's Est.*, 144 Mont. 555, 560, 398 P.2d 616, 619 (1965) (internal quotations omitted).

¶28 Testamentary capacity requires the testator be aware of three elements: (1) the nature of the act to be performed, (2) the nature and extent of the property to be disposed of, and (3) the objects of his or her bounty. *Est. of Harms*, ¶ 14; *In re Est. of Prescott*, 2000 MT 200, ¶ 34, 300 Mont. 469, 8 P.3d 88. Testamentary capacity is determined as of the date the will was executed. *Est. of Harms*, ¶ 15 (citing *Est. of Prescott*, ¶ 35). The proponent of a will has the burden of establishing prima facie proof of its due execution. Contestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation. *Est. of Harms*, ¶ 15 (citing § 72-3-310, MCA). Where a duly executed will is submitted for probate, a presumption exists that the testator was competent and of sound mind. *In re Est. of Brooks*, 279 Mont. 516, 521-22, 927 P.2d 1024, 1027 (1996) (citing *Est. of Bodin*, 144 Mont. at 559, 398 P.2d at 618-19).

¶29 There is evidence in the record that as far back as October of 2002 Aileen was confused and uncertain about her assets, she was paranoid, she often did not know what was happening around her, and she was delusional. She often could not remember people, nor could she recall what she had done with her property. She thought that the sheriff as well as everyone in Richland County was on drugs. She was paranoid and thought people were stealing from her. The District Court found that in August of 2003, Aileen was not truly aware she would be treating her children differently. After hearing the witnesses and reviewing the documentary evidence, the District Court found as a matter of fact that on August 11, 2003, when she signed the holographic will, Aileen did not understand that it would govern the distribution of her assets upon her death and would revoke any prior wills

8

that she may have made and she was not aware of the objects of her bounty. There is substantial evidence in the record to justify the District Court's finding of fact that when she executed the holographic will of August 11, 2003, Aileen did not have testamentary capacity. Such finding is not clearly erroneous. The District Court did not err in concluding the holographic will is invalid.

¶30 As we conclude the District Court did not err in holding that the August 11, 2003, holographic will is invalid because Aileen did not have testamentary capacity, it is not necessary to discuss whether it was the result of undue influence.

¶31 *Issue 2: Did the District Court err in concluding that property transfers were the result of undue influence?*

¶32 Section 28-2-407, MCA, defines what constitutes undue influence:

(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;
(2) taking an unfair advantage of another's weakness of mind; or
(3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

¶33 A court determining whether there has been undue influence may consider relevant factors including: (1) any confidential relationship between the donor and the person allegedly exercising influence; (2) the physical condition of the donor as relevant to her ability to withstand influence; (3) the mental condition of the donor as relevant to her ability to withstand influence; (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and (5) the demands and importunities as they affect the donor, considering the relevant circumstances. The statutory

9

requirements control. The five criteria may, but need not, be present in an undue influence case. They are simply nonexclusive considerations available to guide the trial court in its application of the statutory requirements. *Est. of Harms*, ¶ 21 (citing *In re Est. of Bradshaw*, 2001 MT 92, ¶¶ 15-16, 305 Mont. 178, 24 P.3d 211). The opportunity to exercise undue influence on a person is not sufficient to prove undue influence and invalidate a will or a transfer of property. Rather, the opportunity to exercise undue influence is to be considered and correlated with the alleged acts of influence to determine if the acts amount to undue influence. *Est. of Harms*, ¶ 36 (citing *In re Est. of Lien*, 270 Mont. 295, 304, 892 P.2d 530, 535 (1995) (overruled in part on other grounds); *Est. of Bradshaw*, ¶ 16). This Court has previously stated:

> Mere general influence in the affairs of life or method of living at the time of the execution of a will by a testator is not proof of undue influence in the contemplation of our statute, and, in order to establish it as a fact, it must be shown by proof that it was exercised upon the mind of the testator directly to procure the execution of the will. Mere suspicion that undue influence may have or could have been brought to bear is not sufficient. It is never presumed, and must be proven like any other fact.

*Est. of Wittman*, 2001 MT 109, ¶ 21, 305 Mont. 290, 27 P.3d 35.

¶34 Montana courts consider the same criteria in determining whether a donor making a gift or a testator executing a will was subject to undue influence at the time the gift was made or the will was executed. *In re Guardianship of Mowrer*, 1999 MT 73, ¶ 29, 294 Mont. 35, 979 P.2d 156 (citing *Est. of DeCock v. DeCock*, 278 Mont. 437, 444, 925 P.2d 488, 492 (1996) (overruled on other grounds)). This includes application of § 28-2-407, MCA, and the *Bradshaw* factors, as set forth above. *Guardianship of Mowrer*, ¶¶ 30-31. Also, as part

10

of these criteria, Montana courts examine the surrounding circumstances and the special facts of each case. Any gift must be made by the exercise of the free will of the donor and when the gift is the result of fraud, duress, or undue influence, it may be set aside. Consideration is given to the nature of the relationship between the donor and the donee, the donor's susceptibility to undue influence, and the reasonableness of the transfers in light of the existing circumstances. *Guardianship of Mowrer*, ¶ 32.

¶35 Lee asserts that the District Court could not have found undue influence without positive proof that influence was exerted. He claims there is no evidence demonstrating he influenced Aileen when he acquired her interest in the State Lease or received the money from the oil and gas lease.

¶36 During the time the property transfers in question were made, Lee maintained a confidential relationship with Aileen to the exclusion of Linda. Aileen's health was failing and she had broken bones during the time she was under Lee's care.

¶37 Aileen's mental health was also failing. Attorney Hunnes initially refused to draft a will for Aileen because he believed she was paranoid and delusional. Hunnes at one time called Aileen to determine if she could sign the deed transferring her real property into the trust. Aileen did not remember him.

¶38 Aileen wrote to Hunnes telling him she had taken trust documents to the FSA office and that people were going into the ditch by her house and she needed to pull them out. However, Hunnes had the trust documents, and there is no evidence anyone was in a ditch. One month after that, Aileen executed the February 2003 oil and gas lease with Lee as co-

11

trustees. A little more than six months after that, Aileen made a holographic will leaving all of her earthly possessions to Lee and completely disinheriting Linda. The disposition was unnatural in that it left everything to Lee, at a time when Lee had close contact with Aileen, and disinherited Linda.

¶39 Lee took Aileen to his attorney to draft a will leaving everything to him at a time when she was exhibiting delusions. Hunnes created a living trust instead. Then, Lee called a week later saying Aileen was asking for a will leaving everything to him. When Hunnes declined to draft the will Lee wanted, an attempt was made to have another attorney do so. Around this time, Aileen wrote checks to Lee for the entire amount of the rent and surface damage payments her trust had received from the oil and gas lease.

¶40 The record contains substantial circumstantial evidence supporting the District Court's finding that Lee exercised undue influence over Aileen for the purpose of acquiring her assets.

¶41 The District Court specifically found Lee took advantage of Aileen's weakness of mind from October 2002 to January 2004. The transfer of Aileen's interest in the 640 acre State Lease took place four to five months earlier, in May 2002. Still, in July of 2005, when Aileen was diagnosed with severe cognitive impairment consistent with severe dementia, with significant impairment of memory and executive function, the doctor examining her determined her decline had occurred over three to four years. Thus, there is evidence in the record supporting the District Court's finding that Aileen was suffering from extensive

12

cognitive decline, and was thus susceptible to undue influence, when she transferred her interest in the State Lease to Lee.

¶42    The District Court's findings are not clearly erroneous. Based upon the nature and the timing of the transfers, the District Court did not err in concluding the transfer of Aileen's interest in the State Lease and the payments from the oil and gas lease to Lee were the result of undue influence by Lee.

CONCLUSION

¶43    The District Court judgment of March 11, 2008, is affirmed.

/S/ JOHN WARNER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

13