No.  96-348

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

IN RE THE ESTATE OF

CHRISTINE ELIZABETH TIPP,

Deceased.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Bryan Charles Tipp, Richard R. Buley, Tipp & Buley,
Missoula, Montana

For Respondent:

Clinton H. Kammerer, Kammerer Law Offices, Missoula,
Montana

Submitted on Briefs: December 12, 1996

Decided:   February 4, 1997
Filed:

_____
Clerk


Justice William E. Hunt, Sr. delivered the Opinion of the Court.


Appellant Dorothy Shodin (Dorothy) appeals the decision of the Fourth Judicial District Court, Missoula County, determining that the testamentary will and property transfer of Christine Elizabeth Tipp (Christine) were not entered into as a result of undue influence, and admitting the will to probate. We affirm.

ISSUE

The sole issue presented on appeal is whether the District Court erred in finding that Christineþs will and property transfer were not the products of undue influence.

FACTS

Christine died in 1994 at the age of eighty-six. She and her late husband, George, had seven children including Dorothy, the appellant in this case, and Sylvia, the respondent.

In 1984 or 1985, George became incapacitated by a medical condition which resulted in partial paralysis. At this time, Sylvia became involved in her parentsþ care, managing their finances and transporting them around as needed. Christine did not drive and, by this time, George was no longer able to do so. Because Sylvia so often took them to doctor appointments and ran other necessary errands, George and Christine gave her their car.

Because of Georgeþs partial paralysis, he was placed in a nursing home. The entire family, however, was very dissatisfied with the care he received and he was quickly brought home. In 1988, George died; Christine continued to occupy their home alone after his death. Sylvia and another daughter, Virginia, would look in on their mother and provide whatever assistance she needed. Sylvia continued to provide transportation and to manage Christineþs financial affairs. By 1990, Christine had been diagnosed with advanced breast cancer and was under the care of an oncologist.

In 1992, Christine fell at home and broke her hip. She thereafter required more frequent and continual care, which Sylvia primarily provided. Also in 1992, Sylvia discussed with her mother the possibility of Sylvia buying Christineþs house. Upon hearing of the plan, Sylviaþs brother Ray obtained an appraisal of the house. No other steps were taken in furtherance of such a sale.

In March of 1993, Sylvia twice transported Christine to the office of her attorney. Christine later revealed that the purpose of the visits had been to change her will and to transfer the ownership of her house to joint tenancy with right of survivorship

between herself and Sylvia. In this way, Sylvia would receive the house when Christine died.

In April of 1993, Christine traveled to California to be with her oldest son, who was himself dying of cancer. She made the trip alone and unassisted, and returned to Montana in the same manner. During the time Christine was in California, Sylvia and her husband Gordon moved into Christineþs home. Thereafter, Sylvia was almost entirely responsible for her motherþs care. Christine became increasingly ill and, in February, 1994, she passed away.

Following Christineþs death, her other children became aware of the will she had executed in March, 1993, as well as the simultaneous transfer of the home to joint tenancy with Sylvia. Dorothy then brought suit to prevent the willþs admittance to probate and to set aside the property transfer, asserting that the will and transfer were the products of undue influence. After a thorough hearing, the District Court determined that the will and transfer were not in fact the products of undue influence. The court then ordered the will admitted to probate. Dorothy appeals.

STANDARD OF REVIEW

The case law regarding the standard of review in estate cases at equity is inconsistent and contradictory. On the one hand, this Court has determined that the proper standard of review is whether substantial credible evidence supports the district courtþs findings. See, for example, Christensen v. Britton (1989), 240 Mont. 393, 784 P.2d 908; In re Estate of Palmer (1985), 218 Mont. 285, 708 P.2d 242; Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939. On the other hand, we have also declared that the proper standard of review in such cases is whether the district courtþs findings are clearly erroneous. See, for example, In re Estate of Parini (Mont.1996), 926 P.2d 741, 53 St.Rep. 1062; Flikkema v. Kimm (1992), 255 Mont. 34, 839 P.2d 1293; In re Estate of Flynn (1995), 274 Mont. 199, 908 P.2d 661.

Cases using the "substantial credible evidence" standard of review generally cite  3-2-204(5), MCA, which provides:

[i]n equity cases and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law . . .

In re Estate of Melvin (1993), 261 Mont. 408, 412, 862 P.2d 1159, 1162 (citations omitted); In re Estate of Barber (1989), 239 Mont. 129, 137, 779 P.2d 477, 482. Cases using the "clearly erroneous" standard of review generally cite Rule 52(a), M.R.Civ.P., which provides in part:

In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts

specially and state separately its conclusions of law thereon . . . . Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . .

Flikkema, 839 P.2d at 1296; In re Estate of White (1984), 212 Mont. 228, 231-32, 686 P.2d 915, 916-17.

While nothing in 3-2-204(5), MCA, precludes the use of the "clearly erroneous" test, Rule 52(a), M.R.Civ.P., by its terms, mandates that this more stringent test be applied to "all actions tried upon the facts without a jury or with an advisory jury," without regard for whether the case arises at law or in equity. For this reason, we conclude that the proper standard of review in estate cases at equity is whether the findings of the district court are clearly erroneous. Absent a determination that the findings are clearly erroneous, they will not be set aside. Flikkema, 839 P.2d at 1296.

DISCUSSION

Did the District Court err in findings that Christineþs will and property transfer were not the products of undue influence?

In seeking to have the will and property transfer set aside, Dorothy alleges that the testamentary changes were the products of undue influence asserted upon Christine by Sylvia. Dorothy contends that Sylvia was in a position to assert such influence because of her role as primary care giver to Christine and because of the fact that she lived with Christine. Dorothy further contends that Christine was particularly susceptible to this influence due to her advanced age and illness.

Section 28-2-407, MCA, provides:

Undue influence consists in:

(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

(2) taking an unfair advantage of another's weakness of mind; or

(3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

Section 28-2-407, MCA. See In re Estate of Jochems (1992), 252 Mont. 24, 28, 826 P.2d 534, 536. In determining whether undue influence was exercised, the court must consider the following:

(1) the confidential relationship of the person allegedly attempting to influence the testator;

(2) the physical condition of the testator as it affects his or her ability to withstand the influence;

(3) the mental condition of the testator as it affects

his or her ability to withstand the influence;

(4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and

(5) the demands and importunities as they may have affected the testator, taking into consideration the time, place, and surrounding circumstances.

Jochems, 826 P.2d at 536 (citing In re Estate of Luger (1990), 244 Mont. 301, 303-04, 797 P.2d 229, 231 and Christensen, 826 P.2d at 911). These same criteria are used in determining whether undue influence existed regardless of whether the case involves a donor making a gift or a testator making a will. Cameron, 587 P.2d at 945. Further, as this Court stated in Christensen, "[u]ndue influence is never presumed and must be proven like any other fact." Christensen, 784 P.2d at 911 (citations omitted).

In this case, the evidence clearly showed that Christine and Sylvia had a confidential relationship. Sylvia was not only Christineþs daughter but her primary care giver, and she lived with Christine. Nor is it disputed that Christineþs physical condition might serve to render a donor susceptible to influence; Christine was both elderly and seriously ill at the time she made her will and property transfer. The parties contest, however, whether Christineþs mental condition would render her susceptible to influence. While Sylvia contends that Christine was alert and in possession of all her faculties until just shortly before her death, Dorothy contends that Christine was prone to forgetfulness and confusion, indicating a mental state in which she might be susceptible to undue influence. The testimony of the family members on this point is directly contradictory and cannot be reconciled.

Several other individuals, however, also testified at the hearing regarding Christineþs mental state around the time that she made her will. These other witnesses, unrelated to the family, consistently testified that Christine was fully capable of appreciating her actions and their ramifications when she changed her will and placed Sylviaþs name on the deed to her home. Christineþs doctor testified that as of April of 1993, Christine was "very independent" and in control of her cognitive powers. The secretary to the attorney who made Christineþs will, anticipating possible problems from a will that essentially disinherited several other children, made a point to observe Christineþs demeanor closely while the will was being prepared. When questioned about her impression, the secretary testified:

Q. Is it your belief, based on your knowledge about Christine and your familiarity with her, at least since 1986, that she was fully aware of what she was doing on this particular day?

A. Yes.

Q.   This March 31 of 1993, right?
A.   Yes.
Q.   Did there seem to be any confusion in her mind as far as what it was she was there for?
A.   No, sir.

The attorney who prepared the will similarly testified that he was satisfied that Christine understood what she was doing and the consequences of her acts.  In addition, one of Christineþs neighbors and two hospice workers testified that Christine remained alert and self-possessed even months after the date on which she changed her will.  Furthermore, the evidence presented showed that Christine independently planned a trip to California in the weeks following the change to her will.  Such a trip would have been extremely difficult for an individual whose mental faculties were impaired.  Yet Christine undertook the trip with the encouragement of her children, and apparently experienced no problems while traveling alone.

Given such evidence, the District Court determined that Dorothy had failed to prove the third factor in the above-referenced test for undue influence.  While the testimony in this case conflicted, Sylvia presented evidence which supported the District Courtþs findings regarding Christineþs mental state, and those findings are not clearly erroneous.

Dorothy also contests the District Courtþs finding that she had failed to prove the fourth factor necessary to establish undue influence, the unnaturalness of the disposition.

In arguing that the will and property transfer were unnatural dispositions, Dorothy points out that the arrangements Christine made effectively disinherited all of her children except Sylvia.  This Court has held, however, that  "the fact that a parent might leave the majority of his or her assets to only one child, while excluding others, is not in and of itself unnatural."  In re Estate of Lien (1995), 270 Mont. 295, 305, 892 P.2d 530, 535 (citing Flikkema, 839 P.2d at 1298).

Dorothy argues, however, that the evidence presented nevertheless tended to prove an unnatural disposition in this case.  In particular, Dorothy points out that Christine had another, older will in place for over thirty years which split her estate evenly between all her children, a commitment to "fairness" which she and her husband had honored almost all their lives.  Given this history, Dorothy argues that it was unnatural for Christine to decide, less than a year before her death, to leave the bulk of her estate to only one child.

The fact that Christine already had a will drawn up at the time she decided to change its provisions is largely irrelevant.  No one disputes that she had the absolute right to destroy or change her will at any time, should she choose to do so.  Yet Dorothy insists that the change must have been unnatural because it

contradicted Christineþs previously articulated desire to treat all of her children equally.  There was no reason, Dorothy argues, for Christine to independently wish to make such a radical alteration in her estate planning; therefore, the new will must have been a product of Sylviaþs undue influence.

Yet the testimony of various witnesses at the hearing illuminated probable reasons for Christine to make such a change: her increasingly close relationship with Sylvia and her gratitude to Sylvia for taking care of her.  While it is not disputed that all of Christineþs children loved her, it is also not disputed that Sylvia assumed the greatest share of responsibility in caring for Christine.  Christine herself was apparently acutely aware of this fact.  As a hospice worker testified:

> [Christineþs] main concern was for Sylvia and she told me--this came about when I was talking to them both about long-range care plans and how they were going to manage if they planned to stay at home until her death with her care. [S]he said that, yes, that was, in fact, the agreement that she had made with Sylvia, because she did not want to go to a nursing home, and she had given her other children the opportunity to care for her, and they had chosen not to do it or not to do it in a fashion that she was comfortable with. [S]he told me, in fact, that she was leaving her home to Sylvia in exchange for taking care of her until she died, whether it was tomorrow or, you know, five years from now . . .

The District Court noted that Christine obviously dearly loved all the members of her family and, in her own way, remained close to each of her children.  Nevertheless, given Christineþs articulated rationale for leaving her home to Sylvia and the fact that Sylvia was Christineþs primary care giver, the District Court determined that the will and property transfer in this case were not unnatural.  These findings are not clearly erroneous.

Dorothy further argues that the District Court erred in finding that she had failed to prove the fifth factor, the existence of demands and importunities calculated to affect the testator.  She contends that the deed and will were made at a time when Sylvia controlled all of Christineþs finances and assets.  Dorothy further contends that the will and transfer were made under a threat of institutionalization, a particular fear of Christineþs in light of the substandard care her husband had received in a nursing home years before.

Sylviaþs management of Christineþs finances is not, in and of itself, a "demand or importunity" made upon the donor.  The implication, however, is that Sylvia may have wielded this financial power to force her mother to make a will in her favor.  Yet this theory is pure speculation, unsupported by any of the evidence presented.  The District Court did not err in largely

disregarding it.

Similarly, while certain family members testified that Sylvia had threatened Christine with institutionalization, Sylvia categorically denied ever having done so.  No independent evidence or witnesses were presented to support this allegation, and it was within the discretion of the District Court to disregard this unsubstantiated theory as well.

After an extensive hearing, the District Court found that Dorothy had failed to prove the existence of undue influence.  It consequently declined to set aside the will and property transfer.

Having thoroughly reviewed the record, we determine that the findings of the District Court are not clearly erroneous.  Its decision is therefore affirmed.

/S/  WILLIAM E. HUNT, SR.


We Concur:

/S/  KARLA M. GRAY
/S/  JAMES C. NELSON
/S/  W. WILLIAM LEAPHART
/S/  TERRY N. TRIEWEILER