No. 01-666

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 182

ROSIE PENSE,

        Plaintiff and Respondent,

  v.

JACK LINDSEY and LEE LINDSEY,

        Defendants and Appellants.

APPEAL FROM:    District Court of the Tenth Judicial District,
                    In and for the County of Fergus, Cause No. DV-2000-132
                    The Honorable E. Wayne Phillips, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

                Thomas J. Pardy, Oliver, Pardy & Associates, Billings, Montana; James L. Carbone, Kelly, Harvey & Carbone, Clinton, Washington

        For Respondent:

                Torger S. Oaas, Lewistown, Montana

Submitted on Briefs:  April 18, 2002

Decided:  July 10, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Rosie Pense (Pense) conveyed her 258-acre Fergus County homestead property to Jack and Lee Lindsey (Jack, Lee, or the Lindseys) by Warranty Deed.  Shortly thereafter she requested that the Lindseys return the property to her.  The Lindseys offered to return the land provided their names remained on the deed as joint tenants with rights of survivorship.  This offer was rejected and Pense sued the Lindseys claiming they had exerted undue influence over her.  The District Court agreed and set aside the conveyance.  The Lindseys appeal. We affirm.

## ISSUE

¶2     The dispositive issue in this case is whether the District Court erred when it concluded that the conveyance of land from Pense to the Lindseys was obtained by undue influence.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Pense led a sheltered life on a ranch in one of Montana's most rural counties, Garfield County.  Born in 1911, Pense lived, unmarried, on her parents' 14,000-acre ranch with them until their deaths in 1972 and 1973, at which time she inherited the ranch, as well as 446 acres in Fergus County which included her grandfather's beloved 258-acre homestead which is at issue in this case (homestead property).  Approximately two years after her parents' deaths, at the age of 64, Pense married neighboring ranch-owner Paul Berger (Berger).  Pense and Berger combined their Garfield County ranch lands and worked the combined ranches as one unit until 1998 when Pense and Berger separated.  Pense, who was 87 years

2

old at the time of the separation, then began managing her own affairs and living on her own for the first time in her life.

¶4     Pense and Berger were divorced in 2000 after 25 years of marriage. The net worth of the parties at the time of dissolution was $4,461,920. After equitable distribution of marital assets, Pense had a net worth of $2,490,498 with her grandfather's homestead property being valued at $170,000.

¶5     During her marriage to Berger, Pense met Jack Lindsey, a legal investigator, who was working with an attorney representing Berger in an unrelated Federal District Court matter. Upon conclusion of that matter in 1994, Pense and Jack had little or no contact until the spring or summer of 1998 by which time Pense was suffering from mild to moderate age-onset dementia according to her longtime physician. Pense's doctor explained that while Pense could continue to remain independent, her level of dementia would make it very difficult, if not impossible, to grasp and deal with complex situations such as wills or deeds. The doctor further opined that, as a result of Pense's sheltered upbringing, the dementia, and the difficulty in handling complex situations, Pense was quite "possibly susceptible to influence."

¶6     According to Garfield County Sheriff Charles Phipps, Jack called him in mid-to-late summer of 1998, having heard that Pense and Berger had recently separated, expressed an interest in buying Pense's Fergus County homestead property, and asked Phipps how to contact Pense. This call set in play a relationship between Pense and Jack, and a course of events that saw Pense authorize and then revoke no less than five wills over a period of

3

eighteen months. The wills were prepared first by her divorce attorney Bryan, whom Pense later said prepared a will without being asked to do so; by Jack's employer Stephens, who prepared wills #2 and 5 in the sequence to the benefit of Jack; and by Murnion, who acted as "local counsel" for both Bryan and Stephens, and who prepared two wills falling between the Stephens' wills that omitted any reference at all to Jack. The various wills were remarkable for their disparity--Pense went from endowing to disinheriting her cousins, ranch employees and Jack, usually without any apparent triggering events. One factor above all struck the District Court about these changes in bequest: when Stephens wrote the wills, Jack figured prominently in them, being named personal representative of Pense's estate and inheriting the homestead.

¶7 On November 30, 1999, Pense entered into a Land Lease Agreement with Calvin Paulson, Lee Lindsey's son. Under this Lease Agreement, Paulson could graze cattle, hunt and enjoy other recreational activities on the homestead property for a period of five years. As "payment" for these privileges, Paulson agreed to construct a "homestead" cabin to replace Pense's grandfather's homestead cabin. The following day, December 1, 1999, and thirteen days after signing Murnion Will #2, in which Jack was not referenced, Pense executed Stephens Will #2. In Stephens Will #2, Jack was reappointed Personal Representative and was devised Pense's grandfather's homestead property.

¶8 In May 2000, the Lindseys took Pense for a picnic on her grandfather's homestead property. While there, they told Pense of their plans to rebuild her grandfather's home. The Lindseys testified that Pense was so grateful that she told them she wished them to have the

4

property immediately rather than after her death. Very shortly thereafter, Jack requested that the Stephens law firm prepare a Warranty Deed, and on June 12, 2000, Pense signed a Warranty Deed giving Jack and Lee Lindsey her grandfather's homestead. The Warranty Deed was filed one month later and a certified copy was sent to Pense.

¶9 Upon receiving her copy of the Deed, an agitated Pense went to her longtime accountant, Fred Schell, and showed him the Warranty Deed. According to Schell's affidavit, Pense explained that, **if** (she questioned whether the signature was hers) she signed the Deed, she believed that she was signing an agreement giving the Lindseys access to her grandfather's homestead property for recreational purposes. She stated she did not intend to give this property to the Lindseys or to anyone else at that time. She requested his assistance in getting the property back.

¶10 After initial attempts to recover the property failed, Pense filed a Complaint on November 13, 2000. Subsequently, on November 17, 2000, the Lindseys, Pense, Schell and Sheriff Phipps met to discuss the property, at which time the Lindseys proposed to put her name on the deed with theirs as joint tenants with rights of survivorship. Schell recommended that Pense consider the offer for a few days before accepting or declining it. While not noted in the record, presumably the offer was rejected, as the law suit went forward.

¶11 In the time between Pense's visit with Schell regarding the Warranty Deed and December 21, 2000, Attorney Torger Oaas, at Schell's request, prepared a new Will for Pense. Under the Oaas Will, Jack was no longer Pense's Personal Representative nor were

5

the Lindseys devisees or testamentary recipients. Additionally, two former ranch hands, Terry Kastner (Kastner) and Lonnie Dahl (Dahl), who between them had convinced Pense to pay them approximately $93,000 in unearned "back wages," were also disinherited.

## STANDARD OF REVIEW

¶12    In equitable cases like this one, findings of fact must be upheld unless they are clearly erroneous. *In re Estate of Bradshaw*, 2001 MT 92, ¶ 11, 305 Mont. 178, ¶ 11, 24 P.3d 211, ¶ 11. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *In re Estate of McDermott*, 2002 MT 164, ¶ 22, 310 Mont. 435, ¶ 22, 51 P.3d 486, ¶ 22. Moreover, the evidence is reviewed in the light most favorable to the prevailing party, and the credibility of witnesses and the weight assigned to their respective testimony are up to the trial court. *Bradshaw,* ¶ 11 (citation omitted). Our role in reviewing findings of fact is to determine whether the findings are clearly erroneous; it is not to determine whether there is support in the evidence for findings which were not made. *Bradshaw,* ¶ 11 (citation omitted). Lastly, we review a district court's conclusions of law to determine whether they are correct. *McDermott*, ¶ 22.

## DISCUSSION

¶13    We are asked to determine whether the District Court erred when it concluded that the conveyance of land by Pense to the Lindseys was obtained by undue influence in the form of friendship.

6

¶14    Section 28-2-407, MCA (1999), defines undue influence as: (1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him; (2) taking an unfair advantage of another's weakness of mind; or (3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

¶15    In addition to the statutory definition, courts are also guided by the following five criteria when attempting to discern whether there has been undue influence: (1) any confidential relationship between the person alleged to be exercising undue influence and the donor; (2) the physical condition of the donor as it may affect his or her ability to withstand influence; (3) the mental condition of the donor as it may affect his or her ability to withstand influence; (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to influence; and (5) the demands and importunities as they may affect the donor, taking into account the time, place and surrounding circumstances. *Bradshaw*, ¶¶ 13-14 (citation omitted). As we stated in *Bradshaw*, the statutory requirements control and these five criteria "are simply nonexclusive considerations available to guide the trial court in its application of the statutory requirements." *Bradshaw*, ¶ 16.

¶16    In the case at bar, the District Court first evaluated each of the five above-listed criterion. It concluded that 1) Pense had a confidential relationship with Jack and Lee; 2) Pense had both physical and mental conditions that affected her ability to withstand influence; 3) the disposition of her grandfather's homestead to the Lindseys was unnatural;

7

and 4) the Lindseys' request for a Warranty Deed and the presentation of it to Pense for signature constituted demand and importunity" which play directly on the susceptibility of this particular individual."

¶17 The court then analyzed the three statutory elements of undue influence and concluded that the Lindseys took unfair advantage of Pense's weakness of mind. Section 28-2-407(2), MCA (1999). The court stated,

> Because of the nature of her upbringing, the focus of her whole personality was upon "returning" the kindness of others. This personality was based on a simple, naive disregard for the protection of wealth, that, as Garfield County Attorney Nick Murnion stated, was susceptible to influence. The persistent "friendship" of the Defendants from the date of the phone call inquiry to Sheriff Phipps onward reflected an intensity which Rosie Pense's particular weakness of mind could not resist. Such intensity reflected the taking of an unfair advantage of this weakness of mind.

We review below the evidence relied upon by the District Court to support its findings of fact and conclusions of law.

*Confidential Relationship*

¶18 There is no dispute that the Lindseys developed a confidential relationship with Pense after her separation from her husband. They each testified that they assisted Pense in numerous ways on many occasions. Jack explained legal documents to her, drove her to and from meetings at the law office or to the grocery store or drug store. He installed helpful appliances in Pense's home. Lee washed and colored her hair and helped Pense with other personal or hygiene activities. The Lindseys hosted Pense in their home and took her for scenic drives and picnics. They bought her gifts. They arranged for Pense to stay in their

8

home or the home of other family members on various occasions. Moreover, Jack, at one time, was given Power of Attorney over Pense's health affairs.

¶19    We have previously noted that in most confidential relationships, one party provides to another party basic assistance in the form of personal care, transportation, and/or advice in financial affairs. *See Estate of DeCock v. DeCock* (1996), 278 Mont. 437, 445, 925 P.2d 488, 492, overruled on other grounds by *Bradshaw*; *Matter of Estate of Lien* (1995), 270 Mont. 295, 304, 892 P.2d 530, 535, overruled on other grounds by *Bradshaw*; *Matter of Estate of Long* (1987), 225 Mont, 429, 430-31, 732 P.2d 1347, 1348.

*Physical and Mental Condition as it may Affect Her Ability to Withstand Influence*

¶20    Pense's former husband, Berger, testified that in 1995 or 1996, Pense suffered "some physiological event" that he characterized as "a multiple minor stroke event." He claimed that she demonstrated short term memory loss and noticeable changes in her mental functioning. He stated that a second such event occurred in 1997 or 1998, after which she stopped driving, began walking with a walker, experienced difficulty remembering things, and suddenly and without explanation, ended their marriage. Pense's doctor said he had no medical knowledge of any stroke events but that, as early as 1993, Pense exhibited symptoms of age-onset dementia that gradually decreased her mental capacity over time. A CT scan in 1993 confirmed this diagnosis and a repeat scan in 2001 clearly showed dementia and cerebral atrophy. Additionally, the doctor stated that Pense suffered from hearing loss as well as severe degenerative arthritis causing significant physical pain requiring medication.

¶21 Moreover, the court was presented with substantial and credible evidence that Pense had lived a very sheltered life in rural Montana with limited societal contact outside family and neighbors. Several witnesses testified that she needed the friendship, companionship, and personal attention of others desperately and was extremely generous, in a childlike manner, when responding to even the smallest of kind acts. Additionally, she was naively trusting of everyone. Kastner and Dahl, two former ranch hands, repeatedly approached Pense over several months requesting money. They either convinced Pense that she owed them back wages from when they worked for her former husband or convinced her to indicate on the checks that they were back wages in order to lend an air of legitimacy to their $93,000 ploy. The District Court was presented with several other examples of Pense's "profligate generosity" that led it to conclude that Pense was susceptible to friendly, helpful, or needy people taking advantage of her.

¶22 These physical and mental traits led the District Court to conclude that Pense possessed a "unique weakness of mind," as well as a personality that focused upon her "returning" the kindness of others without regard to the protection of her wealth and assets. In addition to making her extremely susceptible to influence, the District Court concluded that these combined characteristics affected her ability to withstand "persistent, albeit friendly and possibly benign, influence" in the form of friendship.

*Unnaturalness of Disposition as it Relates to Showing a Mind Easily Susceptible to Influence*

¶23    The District Court next concluded that, despite Pense having no living relatives other than her disinherited cousins, her gifting of her grandfather's homestead to the Lindseys was nonetheless unnatural.  The court based this conclusion on 1) the irrevocable finality of the gift; 2) the Lindseys' role in ensuring this irrevocable finality; 3) Pense's agitated state upon recognizing that she had given away her beloved property; and 4) her intense desire to retrieve it.

¶24    The court was persuaded by the evidence that each time Jack was involved in Pense's will preparations, he got the property, and each time he was not involved, someone else got the property.  Moreover, Pense testified that she did not know she had deeded the property to the Lindseys nor had she intended to do so.

¶25    In *Christensen v. Britton* (1989), 240 Mont. 393, 399, 784 P.2d 908, 912, we stated that an unnatural disposition of property can be the "product of an unbalanced mind or one that was easily susceptible to influence."

*Demands and Importunities*

¶26    Lastly, the court looked closely at the timing and circumstances surrounding the demands and importunities that may have affected Pense's ability to withstand the Lindseys' influence, beginning with Jack's call to Sheriff Phipps in the summer of 1998 though June 2000, when Pense signed the Warranty Deed prepared at Jack's behest.  It noted that just prior to Jack arranging to have the Deed prepared, the Lindseys took Pense for an outing on her grandfather's homestead property.  They allowed her to reminisce of her youthful time

11

spent there, and listened attentively as she regaled them, with much excitement and emotion, with stories of her grandfather and his beekeeping activities. They then promised to rebuild the cabin and told her of plans they had for the land. As the Lindseys testified, Pense suddenly announced that she wanted them to have the land before her death so that she, too, could share in their plans. Jack, within a short time after this announcement, made arrangements for the Deed to be prepared and executed.

¶27    The District Court noted that until Pense gave this land to the Lindseys, she was fiercely possessive of her land holdings, to the point of borrowing money in order to buy back some family land that had been distributed to Berger after the divorce. Berger also testified that, during their twenty-five years together, Pense adamantly refused to sell her grandfather's homestead property despite offers from prospective buyers. While specifically stating that it did "not impute evil intent" to the Lindseys for befriending Pense, the court nonetheless noted a "pattern in this case which may not constitute legal intent but which creates a picture which a court of equity must evaluate: If one were intensely friendly with Ms. Pense, she would, literally, give away the family farm."

¶28    Jack denies that he or Lee exerted undue influence over Pense and maintains that she gave them the property willingly and knowingly. Moreover, the Lindseys claim there was no evidence of any solicitation on their part to Pense regarding ownership of her land and that without such solicitation, there is no demand or importunity. We disagree. Solicitation need not be formal or overt. Jack, without question, influenced Pense in many decisions. He influenced her choice of attorneys, where she stayed when traveling, how she spent much

12

of her leisure time, and he convinced her to enter into a lease agreement for the homestead property with his wife's son. Whenever Jack was involved in Pense's will-making, Jack was devised the homestead property. Jack influenced her decision on her Personal Representative and Power of Attorney. Jack and Lee arranged the picnic to the homestead property and when Pense offered to give them the property, Jack had the Deed prepared, executed and recorded. Moreover, when Pense asked for her land back, Jack attempted to set the conditions for its return. We conclude that the timing and the circumstances under which a very susceptible Pense ultimately gave this property to the Lindseys support the District Court's conclusion that the fifth factor, demand and importunity, was met.

¶29 The District Court concluded that all five considerations used to assist a trier of fact in identifying undue influence were present in this case. The court also concluded that Pense possessed a weakness of mind and that the Lindseys' actions over these several months constituted their taking an unfair advantage of that weakness under § 28-2-407(2), MCA (1999).

**CONCLUSION**

¶30 The District Court carefully weighed the evidence and assessed the credibility of the witnesses, observing their demeanor and discerning any motives or potential biases. We conclude that there was substantial evidence presented to the court to support its findings of fact. Based upon our review of this case, we cannot conclude that the District Court's findings of fact are clearly erroneous or that its conclusions of law, founded upon these facts, are incorrect. Therefore, we affirm the District Court.

13

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ JOHN WARNER