No. 03-828

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 320

In the Matter of the Estate of
CHARLES J. HARMS, deceased.

APPEAL FROM:    The District Court of the Sixth Judicial District,
                In and For the County of Park, Cause No. DP 2001-011,
                Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                A. Clifford Edwards, Roberta Anner-Hughes, Edwards, Frickle,
                Anner-Hughes & Cook, Billings, Montana; Kent E. Young,
                Attorney at Law, Red Lodge, Montana (Charles R. "Bo" Harms)

                John S. Warren, Davis, Warren & Hritsco, Dillon, Montana (Diann
                Stephens, Steven Harms, and Thomas Harms)

        For Respondents:

                Keith Strong, Dorsey & Whitney, Great Falls, Montana

                                        Submitted on Briefs:  December 22, 2004

                                                Decided:  December 7, 2006

Filed:

        _____
                        Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    The Sixth Judicial District Court, Park County, determined that the last Will and Testament (2001 Will) of Charles J. Harms (Charlie) would be probated and that Charlie's son Dennis Harms (Dennis), as personal representative of Charlie's estate, would be awarded attorney fees and costs. Charlie's other children—Charles R. "Bo" Harms, Diann Stephens, Steven "Steve" Harms, and Thomas "Tom" Harms (hereinafter Contestants)—appeal. We affirm.

¶2    The Contestants raise the following issues on appeal:

¶3    1.    Did the District Court err when it determined Charlie was competent to execute the 2001 Will?

¶4    2.    Did the District Court err when it determined Charlie was not acting under undue influence in executing the 2001 Will?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    Charlie owned the Harms Livestock Ranch located northwest of Livingston, Montana. Charlie and his wife, Bernice, were married in 1939. Together they had five children (listed above). Their oldest son, Bo, lived and worked on the ranch for over 30 years, leaving in the fall of 1991. Dennis spent his entire adult life working with his father on the ranch and was working on the ranch when Charlie died. Steve moved to Arizona, having never worked on the ranch during his adult life. While Tom lived on the ranch, he did not work on the ranch full-time during his adult life. While not living directly on the ranch, Diann took on different responsibilities with the ranch throughout her life, such as serving as secretary/treasurer of the ranch corporation.

2

¶6 Testimony from trial indicated that Charlie and Bernice planned to leave half of the ranch, the "Upper Ranch," to Bo and the remaining half, the "Lower Ranch," to Dennis. In 1993, four years before Bernice's death, Charlie and Bernice executed wills that divided their ranch property among their five children, with preferential treatment in ranch stock given to the children operating the ranch (Bo and Dennis). This plan included a life insurance policy which would pay benefits of $100,000.00 each to Tom, Steve, and Diann (the children who did not live and work on the ranch during their adult lives) upon either Charlie's or Bernice's death.

¶7 After Bernice's death in 1997 when the $100,000.00 life insurance policies were paid to Tom, Steve, and Diann, several meetings and discussions took place between Charlie, various members of the family, and occasionally representatives of the Crowley Law Firm in Billings, Montana regarding the disposition of the ranch upon Charlie's death. Despite these meetings, a new will was not prepared or executed until the 2001 Will was put in place.

¶8 In September of 2000, Charlie chose to cease his relationship with the Crowley Law Firm, instead retaining the services of Bjarne Johnson, a ranch estate tax and probate attorney in Great Falls, Montana. Charlie met with Johnson on September 19, 2000, to discuss estate planning options. Johnson testified that he had never met Charlie and did not know whether or not Charlie already had a will in place. Roughly one week after the initial meeting with Charlie, Johnson received an unsolicited e-mail from Diann which expressed concern regarding Charlie's plans. Specifically, the e-mail informed Johnson that Charlie had been represented by the Crowley Law Firm for roughly 30 years and that

3

Charlie had been recently diagnosed with Alzheimer's disease. Johnson testified that Diann's e-mail prompted him to pay particular attention to the issues of Charlie's competence and any possible undue influence involved.

¶9 In response to these concerns, Johnson contacted Dr. Ted Scofield, Charlie's physician for the last year of his life. Dr. Scofield made it clear to Johnson that while Charlie did exhibit symptoms of mild senile dementia of the Alzheimer's type, Charlie was competent to make decisions regarding his estate. During the estate planning process, Johnson observed that Charlie was aware of the nature and extent of his property, the identities of and the relationships involved with his children at the time, and the reasons for estate planning. Further, Johnson testified that Charlie presented himself well and that ultimately, Charlie's goal was to avoid selling the ranch. Concerning Charlie's health, testimony at trial indicated that Charlie went through occasional episodes of confusion and incontinence. However, Charlie was self-sufficient in that he lived on his own at the ranch and was able to drive himself around the ranch as he saw fit.

¶10 Johnson drafted the 2001 Will (at the complete direction of Charlie) in the following fashion: Diann was disinherited; all corporate stock in the ranch was given to Dennis; and Bo was left with those assets still in his name as a joint tenant or payee on Charlie's pay-on-death accounts. Johnson was not able to meet Charlie in person to sign the 2001 Will. Thus, Johnson mailed a copy of the 2001 Will to Charlie on January 16, 2001, and subsequently mailed the original 2001 Will to Lance Lovell, an attorney in Big Timber, Montana. Johnson then asked Lovell to sit in his place to witness Charlie sign

4

the original 2001 Will. Charlie signed the will on January 25, 2001, and died unexpectedly two days later, on January 27, 2001, of an apparent heart attack.

¶11 Dennis filed a petition to admit the 2001 Will to informal probate on February 5, 2001. Contestants opposed Dennis's petition, seeking the 2001 Will be set aside and for the District Court to declare that Charlie died intestate. The District Court held a bench trial on the validity of the 2001 Will. It heard testimony from numerous witnesses and entered findings of fact, conclusions of law, and an order. The court concluded that Charlie was competent to create and execute the 2001 Will. Moreover, the court determined that the 2001 Will was not a product of undue influence on the part of Dennis. The Contestants appeal.

## STANDARD OF REVIEW

¶12 Section 3-2-204(5), MCA, and M. R. Civ. P. 52(a), require that in equitable cases like this one, findings of fact must be upheld unless they are clearly erroneous. *In re Estate of Bradshaw*, 2001 MT 92, ¶ 11, 305 Mont. 178, ¶ 11, 24 P.3d 211, ¶ 11. We must examine whether the findings are supported by substantial credible evidence. *Bradshaw*, ¶ 11. The evidence is reviewed in the light most favorable to the prevailing party, and the credibility of witnesses and the weight assigned to their respective testimony are up to the trial court. *Bradshaw*, ¶ 11 (citing *In re Guardianship of Mowrer*, 1999 MT 73, ¶ 36, 294 Mont. 35, ¶ 36, 979 P.2d 156, ¶ 36). Further, our role is not to determine whether there is support in the evidence for findings which were not made. *Cenex Pipeline LLC v. Fly Creek Angus*, 1998 MT 334, ¶ 35, 292 Mont. 300, ¶ 35, 971 P.2d 781, ¶ 35. We review a

district court's conclusions of law to determine whether those conclusions are correct. *Guthrie v. Hardy*, 2001 MT 122, ¶ 24, 305 Mont. 367, ¶ 24, 28 P.3d 467, ¶ 24.

## DISCUSSION

### Issue 1.

¶13 *Did the District Court err when it determined Charlie was competent to execute the 2001 Will?*

¶14 The test for testamentary capacity was set forth in *In re Bodin's Estate*, 144 Mont. 555, 560, 398 P.2d 616, 619 (1965), as follows:

> [A] testator is competent if he is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of his property and his relations to persons having claims on his bounty whose interests are affected by his will . . . . The "testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them."

(Citations omitted). Therefore, testamentary capacity requires three elements that the testator be aware of: (1) the nature of the act to be performed; (2) the nature and extent of the property to be disposed of; and (3) the objects of his or her bounty. *In re Estate of Prescott*, 2000 MT 200, ¶ 34, 300 Mont. 469, ¶ 34, 8 P.3d 88, ¶ 34.

¶15 Testamentary capacity is determined as of the date the will was executed, January 25, 2001, in this case, using the above test from *Estate of Bodin*. *Prescott*, ¶ 35. Proponents of a will have the burden of establishing prima facie proof of due execution while contestants of a will have the burden of establishing lack of testamentary intent or

6

capacity, undue influence, fraud, duress, mistake, or revocation. Section 72-3-310, MCA.

¶16 In the case *sub judice*, the Contestants challenge the District Court's finding that Charlie was competent to create and execute the 2001 Will. They argue there is no evidence that Charlie knew and understood the contents and effect of the document he was signing. The Contestants point out that it took Charlie a long time to read the will, that Charlie never recited the terms of the will or identified the parties involved in the will, and that no attorney ever went over the terms of the will with Charlie in draft or final form. The Contestants point to the testimony of Dr. Donna Veraldi, a psychologist, who testified that a person with some form of Alzheimer's disease often has the tendency to appear and act as if they understand what is being said to them, but that there is no way to determine if the person truly understands. Dr. Veraldi was not able, however, to provide any opinion regarding Charlie's mental capacity on January 25, 2001.

¶17 Three individuals testified as to their observations regarding Charlie's testamentary capacity and demeanor on January 25, 2001. Lovell testified at trial regarding his encounter with Charlie: "I asked [Charlie] at that point, is this your last will and testament? Is this what you want to execute? [Charlie] said I do. This is correct." Lovell further testified that Charlie carefully read over the will and that Lovell had "no question" Charlie understood and considered the will.

¶18 The other two witnesses to the signing of the 2001 Will, Sandra Callahan and Katherine Dreese, testified by deposition to the same facts as Lovell. Specifically, Dreese testified she worked in Lovell's office, witnessed Charlie sign the will, and heard

Charlie say, "this is exactly what I asked for" after Charlie read the will. Dreese further testified that "it was very clear that [Charlie] understood why he was there." Callahan testified that Charlie knew he was there to sign his will and that Charlie appeared to understand what was going on. Both Dreese and Callahan testified that Charlie appeared in good health, was well-groomed, and dressed appropriately.

¶19 No other evidence was presented from any other person directly familiar with Charlie's mental condition on the date he executed the 2001 Will. Therefore, we hold that the District Court's determination that Charlie was competent to execute the 2001 Will was supported by substantial credible evidence and was not clearly erroneous.

**Issue 2.**

¶20 *Did the District Court err when it determined Charlie was not acting under undue influence in executing the 2001 Will?*

¶21 Section 28-2-407, MCA, defines undue influence as:

(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

(2) taking an unfair advantage of another's weakness of mind; or

(3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

To determine whether there has been undue influence, a court may consider: (1) any confidential relationship between the person alleged to be exercising undue influence and the donor; (2) the physical condition of the donor as it may affect his or her ability to withstand influence; (3) the mental condition of the donor as it may affect his or her ability to withstand influence; (4) the unnaturalness of the disposition as it relates to

8

showing an unbalanced mind or a mind easily susceptible to influence; and (5) the demands and importunities as they may affect the donor, taking into account the time, place, and surrounding circumstances. *Bradshaw*, ¶ 13; *Mowrer*, ¶ 31. The five criteria may, but need not, be present in any undue influence case. The statutory requirements still control. The five criteria are simply nonexclusive considerations available to guide the trial court in its application of the statutory requirements. *Bradshaw*, ¶ 16 (citing *Cameron v. Cameron*, 179 Mont. 219, 229, 587 P.2d 939, 945 (1978)).

¶22 In determining that Charlie's 2001 Will was valid and not a product of undue influence, the District Court set forth findings under each of the five above-listed criteria. It concluded that: (1) a confidential relationship existed between Charlie and Dennis, but that a confidential relationship also existed at times between Charlie and Diann, Charlie and Diann's husband, and Charlie and Tom; (2) Charlie was not as healthy (either mentally or physically) as he was in earlier years, but Charlie was healthy and self-sufficient, alert, oriented, aware, and competent to do estate planning and make estate decisions both on October 9, 2000, the day Charlie explained to Johnson how he wished his property to be devised, and January 25, 2001, the day Charlie executed the 2001 Will; (3) the disposition of this case was not unnatural based on Charlie's desire to keep the ranch intact and because Dennis was the only child who stayed and worked on the ranch his entire life; and (4) there were no demands and/or importunities on the part of Dennis in regards to the 2001 Will.

¶23 We review below whether there is substantial credible evidence which supports the District Court's findings of fact.

9

*Confidential Relationship*

¶24   The District Court found that a confidential relationship existed between Charlie and Dennis. Dennis worked closely with Charlie starting in 1967 until Charlie's death in 2001. Dennis would chauffeur Charlie around, help him with errands, and take him to his hospital appointments. The District Court further found, however, that confidential relationships between Charlie and Diann, Charlie and Diann's husband, and Charlie and Tom existed as well. Diann served as the secretary/treasurer of the ranch and helped Charlie with his personal expenses and tasks. She also went on several vacations with Charlie and on occasion, discussed the future of the ranch with Charlie. Further, Diann's husband, David Stephens, assisted in Charlie's affairs by setting up a computer for bookkeeping purposes and periodically worked directly for Charlie. Stephens and Charlie considered themselves friends and frequently socialized with each other. Finally, Tom continued to live on the ranch as an adult, but only periodically worked for Charlie during the 1990's. During the last months of Charlie's life, Tom would go hunting with Charlie and frequently have breakfast with Charlie. Tom would also drive Charlie around and discuss whether or not Charlie should sell the ranch.

¶25   We have previously noted that in most confidential relationships, one party provides to another party basic assistance in the form of personal care, transportation, and/or advice in financial affairs. *Pense v. Lindsey*, 2003 MT 182, ¶ 19, 316 Mont. 429, ¶ 19, 73 P.3d 168, ¶ 19 (citations omitted). The record supports the District Court's finding that Dennis, Diann, David Stephens, and Tom all served these functions for Charlie at certain points throughout their lives. The mere opportunity to exercise

influence on the testator is not sufficient to prove undue influence and invalidate a will. *In re Estate of Wittman*, 2001 MT 109, ¶ 14, 305 Mont. 290, ¶ 14, 27 P.3d 35, ¶ 14 (citation omitted). While the testimony in this case did conflict regarding confidential relationships, all parties presented evidence which supported the District Court's findings. We hold that those findings are not clearly erroneous.

*Physical and Mental Condition as it may*
*Affect His Ability to Withstand Influence*

¶26 Under the second and third criteria, the District Court found that Charlie consistently resisted suggestions about what to do with his property and that Charlie was healthy, self-sufficient, alert, oriented, and aware. Testimony at trial supported the District Court's findings. For example, Dr. Scofield testified that Charlie's occasional confusion was related to diabetes medication and that the medication had no permanent effects on Charlie's mental abilities. Dr. Scofield expressed to Johnson that despite his symptoms of Alzheimer's disease, Charlie was competent to engage in estate planning. Johnson testified that in all his meetings with Charlie, that Charlie recognized him, was aware of previous conversations, understood the content of the meetings, did not drift, and never asked Dennis for any assistance or information. Johnson testified that Charlie was clean, well-groomed, and dressed appropriately. Moreover, testimony at trial indicated that Charlie resisted efforts to sell portions of the ranch.

¶27 The Contestants point out that the foregoing findings were made by the District Court in the context of evaluating Charlie's mental and physical "capacity." They observe that factors two and three from *Bradshaw*, however, are directed at "condition,"

11

not "capacity"—particularly "the physical [and mental] condition of the donor as it may affect his or her ability to withstand influence." *Bradshaw*, ¶ 13. The Contestants contend a proper analysis of undue influence requires evaluation of a weakness of mind or a mind susceptible to influence pursuant to § 28-2-407(2), MCA, as "[p]roof of undue influence does not necessarily depend upon a showing of mental incapacity on the part of the donor." *Luke v. Gager*, 2000 MT 377, ¶ 38, 303 Mont. 474, ¶ 38, 16 P.3d 377, ¶ 38, *overruled in part on other grounds*, *Bradshaw*, ¶ 16. Contestants further rely on the case of *Matter of Estate of Aageson*, 217 Mont. 78, 702 P.2d 338 (1985), to attempt to differentiate between testamentary capacity and weakness of mind with respect to undue influence. Specifically, Contestants interpret the rule from *Aageson* as a mentally competent person may still have a weakness of mind which renders him susceptible to undue influence and that Charlie fit into this category. Contestants argue that despite finding that Charlie was competent to execute his will, the District Court erred in not evaluating Charlie's alleged weakness of mind to properly determine whether undue influence occurred.

¶28 Contestants are correct in their interpretation of *Aageson* and are also correct that the District Court misstated the *Bradshaw* factors by evaluating Charlie's mental and physical "capacity" rather than Charlie's mental and physical "condition." The District Court did, however, make a finding of fact specifically in regards to Charlie's mental and physical condition as it may affect his alleged weakness of mind. The court found that Charlie "consistently resisted anyone's suggestions about what he should do with his property . . ." and further, that he was healthy and self-sufficient, alert, oriented, and

12

aware. These findings were made directly in line with the second and third elements of the *Bradshaw* test and address Charlie's alleged weakness of mind and any undue influence that may have come from it. Contestants mischaracterize the District Court's findings as applying only to testamentary capacity. Although the District Court's observations concerning Charlie's capacity are distinguishable from the issue of mental condition, the court nevertheless made the requisite findings contemplated by *Bradshaw* under factors two and three. We hold that these findings are supported by substantial credible evidence and are not clearly erroneous.

*Unnaturalness of a Disposition as it Relates to*
*Showing a Mind Easily Susceptible to Influence*

¶29    The District Court found the disposition of the 2001 Will was not unnatural. In arguing against the District Court's finding, Contestants point out that the arrangements Charlie made effectively disinherited all of his children except Dennis. This Court has held, however, that "the fact that a parent might leave the majority of his or her assets to only one child, while excluding others, is not in and of itself unnatural." *In re Estate of Tipp*, 281 Mont. 120, 126, 933 P.2d 182, 185 (1997).

¶30    In arguing that the 2001 Will was an unnatural disposition, Bo points out that he gave up his high school education to work for Charlie and spent almost the exact same number of years that Dennis did on the ranch. Bo further asserts that Charlie continually made efforts to give the ranch to both Dennis and Bo as evidenced by Charlie's first will and several of Charlie's statements made after Bernice died in 1997. Specifically, Bo contends that because Diann, Steve, and Tom each received $100,000.00 in life insurance

13

proceeds after Bernice's death, it is clear that Charlie intended Bo to receive half of the ranch as he and Dennis were both left out of the life insurance proceeds and any result otherwise would be unnatural.

¶31 Charlie had the "absolute right to destroy or change [his] will at any time, should [he] choose to do so." *See Tipp*, 281 Mont. at 126, 933 P.2d at 186. Despite this, Bo argues the change must have been unnatural because it contradicted Charlie's previously articulated desire to leave half the ranch to Bo and half the ranch to Dennis. Bo further stresses that there was no reason for Charlie to radically alter his will unless the alteration was the product of Dennis's undue influence.

¶32 The District Court concluded, however, that the disposition of this case was not unnatural. The court based its conclusion on testimony that Charlie's stated desire was to keep the ranch intact and that Dennis was the only sibling that had stayed on the ranch his entire life to work. Testimony from trial indicated that Charlie had obviously deeply cared for Bo and respected his work on the ranch. Nevertheless, given Charlie's articulated rationale for keeping the ranch intact as testified by Johnson at trial, the District Court determined that the results of the 2001 Will were not unnatural. We hold that these findings are not clearly erroneous.

*Demands and Importunities*

¶33 Lastly, the District Court examined the timing and circumstances surrounding the demands and importunities that may have affected Charlie's ability to withstand any possible influence. The court concluded there were no demands and importunities on the

14

part of Dennis in regards to the 2001 Will. The court did, however, find demands and importunities on the part of the Contestants.

¶34 The Contestants assert that Dennis repeatedly took unfair advantage of Charlie's mental condition. Specifically, the Contestants argue Dennis inappropriately forced Charlie to remove Diann as his power of attorney, to not allow Diann to cash Harms Livestock checks, to cease the Crowley Law Firm's representation of Charlie, and ultimately to have Johnson prepare the 2001 Will. Dennis responds that the Contestants arranged meetings with or without the assistance of counsel in an attempt to direct Charlie on how to handle his estate matters. Specifically, Dennis points out the Contestants contacted the Crowley Law Firm to make it clear they intended to prevent the ranch from being devised disproportionately and that Diann sent an e-mail to Johnson in an effort to make him aware that Charlie had Alzheimer's disease. Dennis contends the Contestants produced no evidence at trial that he pressed any demands or importunities upon Charlie. The District Court agreed with Dennis in finding no demands or importunities on his part. Based on our review of the record, we conclude those findings are not clearly erroneous.

¶35 The District Court concluded that none of the five considerations used to assist a trier of fact in identifying undue influence were present in this case. The court heard conflicting testimony regarding Charlie's mental capacity and any alleged undue influence that may have taken place. However, as we have frequently held, the District Court is in the best position to observe and examine the demeanor and candor of the witnesses, judge their credibility, and decide whether the parties have met their burden of

15

proof; therefore, we will not second guess the District Court's determination regarding the strength and weight of conflicting testimony. *In re Marriage of Mease*, 2004 MT 59, ¶ 50, 320 Mont. 229, ¶ 50, 92 P.3d 1148, ¶ 50 (citing *Double AA Corp. v. Newland & Co.*, 273 Mont. 486, 494, 905 P.2d 138, 142 (1995)).

¶36 At most, the Contestants showed that Dennis had the opportunity to exercise undue influence. However, the opportunity to exercise undue influence on the testator is not sufficient to prove undue influence and invalidate a will. Rather, the opportunity to exercise undue influence is to be considered and correlated with the alleged acts of influence to determine if the acts amount to undue influence. *Matter of Estate of Lien*, 270 Mont. 295, 304, 892 P.2d 530, 535 (1995), *overruled in part on other grounds*, *Bradshaw*, ¶ 16. This Court has previously stated:

> Mere general influence in the affairs of life or method of living at the time of the execution of a will by a testator is not proof of undue influence in the contemplation of our statute, and, in order to establish it as a fact, it must be shown by proof that it was exercised upon the mind of the testator directly to procure the execution of the will. Mere suspicion that undue influence may have or could have been brought to bear is not sufficient. It is never presumed, and must be proven like any other fact.

*Wittman*, ¶21. Here, while the Contestants may have suspected that undue influence was brought to bear on Charlie by Dennis, the District Court concluded that they had not met their burden of proving it, pursuant to Section 72-3-310, MCA.

¶37 Consequently, viewing the evidence in the light most favorable to the prevailing party—Dennis, in this case—as we are constrained to do, *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 9, 294 Mont. 478, ¶ 9, 982 P.2d 1002, ¶ 9, we hold there was sufficient credible

16

evidence to support the District Court's findings and the District Court did not misapprehend the effect of that evidence.

¶38 Accordingly, we hold that the District Court did not err in concluding that Charlie was competent to execute the 2001 Will and that Dennis did not unduly influence Charlie in the creation and the terms of the 2001 Will.

¶39 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE